US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

JAN 0 2 2018

DOUGLAS F. YOUNG, Clerk
Deputy Clerk

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF ARKANSAS

DAVID A. STEBBINS                                          PLAINTIFF

VS.                                 CASE NO. 3:17-cv-03092

STATE OF ARKANSAS, ARKANSAS
REHABILITATION SERVICES, AND AMY JONES          DEFENDANTS

## BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following Brief in

Support of my Motion for Partial Summary Judgment.

### SECTION I: PRELIMINARY ISSUES

1.      Before we continue, I wish to remind the Court of some very important limitations on its

power.

2.      First, this Court cannot raise new claims or defenses sua sponte, unless it pertains to the

Court's subject-matter jurisdiction.

(a)     See Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011) ("Under [the adversarial

system], courts are generally limited to addressing the claims and arguments adv-anced by

the parties. Courts do not usually raise claims or arguments on their own")

(b)     See also Sanchez-Llamas v. Oregon, 548 US 331, 356-57 (2006) ("The consequence

of failing to raise a claim for adjudication at the proper time is generally forfeiture of that

claim. As a result, rules such as procedural default routinely deny 'legal significance' ... to

otherwise viable legal claims").

(c)     See also Sayre v. Musicland Group, Inc., 850 F. 2d 350, 353 (8th Cir. 1988) (failure to

plead affirmative defenses constitutes waiver of that defense, even if not specifically listed in

Rule 8(c)).

(d)     See also Sartin v. Commissioner of Pub. Saf. of St. of Minn., 535 F. 2d 430, 433 (8th Cir. 1976) (same).

3.     This means that, if the Defendants, in their response to this motion, fail to establish any dispute of material fact, this Court cannot "bail out" the Defendants by raising its own disputes of material fact. To do so would cause the court to become an advocate for the defense, and I should not even have to explain to you why that is not allowed.

4.     I would also like to remind this Court that it cannot issue an order without giving an explanation behind it. Failure to give an explanation constitutes an automatic abuse of discretion.

(a)     See US v. Burrell, 622 F. 3d 961, 964 (8th Cir. 2010) ("We have held that a district court need not give lengthy explanations ... but this does not permit a district court to give no explanation for its decision");

(b)     See also Rayes v. Johnson, 969 F. 2d 700, 704-705 (8th Cir. 1992) ("The district court may have had reason to deny Rayes' request for subsequent counsel, but no explanation appears in the record. The request was summarily denied twice.")

(c)     See also Slaughter v. City of Maplewood, 731 F. 2d 587, 589 (8th Cir. 1984) ("we neverthe-less find it necessary to remand because we cannot determine from the record whether the district court exercised a reasoned and well-informed discretion, so as to permit our review for abuse of discretion")

(d)     See also Foman v. Davis, 371 US 178, 182 (1962) ("[O]utright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.")

(e)     See also Gulf Oil Co. v. Bernard, 452 US 89, 103 (1981) ("We conclude that the imposition of the order was an abuse of discretion. The record reveals no grounds on which

the District Court could have determined that it was necessary or appropriate to impose this order.")

(f)     See also US v. Walters, 643 F. 3d 1077, 1080 (8th Cir. 2011) ("given the lack of specific findings and the evidence in the record, we find that the district court abused its discretion").

(g)     See also Jarrett v. ERC Properties, Inc., 211 F. 3d 1078, 1084 (8th Cir. 2000) ("The district court's good faith finding was stated in conclusory fashion with no explanation ... Therefore, the court abused its discretion").

(h)     See also Thongvanh v. Thalacker, 17 F. 3d 256, 260 (8th Cir. 1994) ("A careful review of the record reveals no explanation whatsoever for the reduction. Accordingly, the jury award of $4,000 is restored").

(i)     See also Purcell v. Gonzalez, 549 US 1, 8 (2006) ("There has been no explanation given by the Court ... we vacate the order of the Court of Appeals")

(j)     See also Press-Enterprise Co. v. Superior Court of Cal., Riverside Cty., 464 US 501, 513 (1984) ("Thus not only was there a failure to articulate findings with the requisite specificity but there was also a failure to consider alternatives to closure and to total suppression of the transcript. The trial judge should seal only such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected.")

(k)     See also United States v. Grinnell Corp., 384 US 563, 579 (1966) ("The District Court gave no explanation for its refusal to grant this relief. It is so important and customary a provision that the District Court should reconsider it").

(l)     See also Delaware v. Van Arsdall, 475 US 673, 680 (1986) ("In so doing, it offered no explanation why the Chapman harmless-error standard ... is inapplicable here.")

5.　　This means that, if this Court wishes to deny this Motion, it must actually state with particularity which facts are in dispute, point to the evidence presented by the defense to show that this dispute exists1, and provide citations of law.

6.　　This means that this Court cannot simply say that whatever material fact is "still in dispute" and end the analysis there. It must show what evidence the Defense has that actually disputes my evidence.

7.　　With that said, let us move onto the Brief proper.

## SECTION II: FACTS OF THE CASE

8.　　On December 1, 2015, I entered the ARS office in Harrison, AR and applied for public money to fund a college education.

9.　　The ARS has four (4) basic eligibility requirements to being eligible for any public benefits from their office. First, I must have a disability. Second, this disability must in some "impediment to employment." Third, I must be capable of succeeding in the workforce with some assistance from ARS. Fourth, I must actually require the ARS's assistance to achieve employment success.

10.　　I have several disabilities including, but not limited to, Asperger Syndrome and depression.

11.　　On December 15, 2015, the ARS decided to deny my application for funding. Their logic was that, because my disabilities caused me to be "unlikely to succeed in the workforce," I fail to meet Eligibility Requirement No. 3.

12.　　I filed this lawsuit, claiming that this decision was an act of disability discrimination. The Defendants filed a Motion to Dismiss, arguing that (A) I have to be "likely to succeed in the workforce" to be eligible for ARS benefits, and (B) the ARS had sole discretion to decide

whether I was likely to succeed in the workforce, whether the federal courts liked it or not, even if they considered factors that would otherwise violate the ADA, including but not limited to my disabilities.

13.     Magistrate Judge J. Thomas Ray issued a Recommended Partial Disposition in this case, stating the following:

> "In ADA cases, rather than simply deferring to an entity providing the service in question and deeming its eligibility rules to be sacrosanct, a reviewing court must undertake an independent analysis of the importance of an eligibility requirement for a public program or benefit. It is inconstitent with the ADA to elevate the unilateral approval of the entity accused of discrimination to the status of an essential eligibility requirement ... thus, in determining whether Stebbins is a 'qualified individual with a disability' for Title II purposes, the Court is not bound by Defendant ARS's determination that he was not qualified to receive its benefits."
> See Doc. 51, pp. 12-13 (citations and quotations omitted).

14.     I bring this up, not to try and convince the Court that this opinion is binding and controlling law, Rather, I want to emphasize that, in issuing this opinion, the Magistrate Judge unequivocally put the parties on notice that it was to be litigated whether or not "likelihood of success in the workforce" is in fact an essential eligibility requirement. In other words, the Defendants cannot claim that they did not know they were supposed to provide evidence for this fact, because that paragraph from the Recommended Partial Disposition unambiguously told them that this was going to be a disputed fact. If the Defendants have produced no evidence to this effect, it is because they do not have any evidence to present, not because they did not know they were expected to produce any evidence.

15.     However, that Recommended Partial Disposition does not specify which party holds the burden of proof on that question of fact. I maintain that the Defendants do, and I will provide case law to support my position when I get to the "Law and Discussion" section of this brief.

16.     The Defendants have offered absolutely no evidence that Eligibility Requirement No. 3 is

actually an "essential" eligibility requirement. See **Undisputed Fact No. 4**. So if this Court agrees with me that the Defendants hold the burden of proof, then I am entitled to judgment as a matter of law on this issue.

17.     Moreover, the "qualified individual" inquiry does not end even if the Court accepts Defendants' contentions that "likelihood of success in the workforce" is an essential requirement for obtaining benefits from ARS *and* that I failed to meet that requirement. Defendants must provide reasonable accommodations and modifications in policies. In other words, "by the express words of Congress, it is not necessary for a person to meet all eligibility requirements. Instead, if a proposed modification of those requirements is 'reasonable,' a person can be a 'qualified individual.'" See *Pottgen v. Missouri St. High Sch. Activities Ass'n*, 40 F. 3d 926, 932 (8th 1994).

18.     The Defendants have offered absolutely zero evidence that my proposed accommodation is unreasonable (and no, the mere fact that Amy Jones said that she, personally, did not think it was reasonable does not count; see Federal Rule of Evidence 702). Therefore, if this Court agrees with me that the Defendants hold the burden of proof, I am entitled to judgment as a matter of law on this issue.

19.     After this lawsuit got filed, the Defendants attempted to create a brand new excuse for their adverse action: That I engaged in hostility with various ARS employees while the application was still pending. However, in doing so, they committed one very fatal tactical error: They did not include the original declarants of these statements as witnesses. Therefore, these declarants cannot be called because they would be surprise witnesses. This means that they have no evidence of any hostile behavior that is actually admissible. Therefore, their claims that I threatened them must fail automatically.

20.     But even if the Defendants could prove, using evidence that is not hearsay, that I issued

any threats to them, it still does not matter, since they clearly would have not made the same decision they did just on the alleged threatening statements alone.

## SECTION III: LAW AND DISCUSSION

21.     For the following reasons, I am entitled to judgment as a matter of law on the claim of Title II disability discrimination.

### Sub-Section 1: Defendants have not proven that "likelihood of success in the workforce" is an essential eligibility requirement.

22.     The parties were unequivocally put on notice by Magistrate Judge J. Thomas Ray that it was a dispute of material fact whether or not Eligibility Requirement No. 3 – that the plaintiff is "likely to succeed in the workforce" – is in fact an "essential" eligibility requirement.

23.     To be an "essential" eligibility requirement, it must be one that is so vital to the service provided that waiving, curbing, or relaxing the requirement would fundamentally alter the nature of the service. The key word here is "fundamentally." In other words, the slightest inconvenience does not permit the Defendants to discriminate on the basis of disability.

24.     The Supreme Court case of PGA Tour, Inc. v. Martin, 532 U.S. 661 (2001) provides substantial guidance and precedent in interpreting whether or not a modification to a policy would in fact "fundamentally" alter the service provided. In that case, the primary factual dispute was whether permitting the plaintiff to use a golf cart would have fundamentally altered the nature of the golf competition. In support of their position, the Defendants offered expert testimony that "fatigue can be a critical factor in a tournament, particularly on the last day when psychological pressure is at a maximum. Their testimony makes it clear that, in their view, permission to use a cart might well give some players a competitive advantage over other players who must walk." Id at 670-71. The District Court nevertheless found – and the Supreme Court affirmed – that this alone does not suffice as a "fundamental" alteration to the nature of the

tournament. In the exact words of the Supreme Court ...

> "A modification that provides an exception to a peripheral ... rule without impairing its purpose cannot be said to 'fundamentally alter' the tournament. What it can be said to do, on the other hand, is to allow [the Plaintiff] the chance to qualify for ... the athletic events petitioner offers to those members of the public who have the skill and desire to enter. That is exactly what the ADA requires." See *id* at 690.

25. So let us take that definition of "fundamental alteration," and apply it to the instant case. I have proposed a modification to their policies whereby a disabled citizen of Arkansas would be eligible for ARS benefits unless his disabilities were so severe that his vocational rehabilitation was impossible. See **Exhibit 2, Interrogatory No. 1**. In other words, in order for a citizen to fail Requirement No. 3, he cannot simply be "unlikely" to succeed in the workforce; he must be *completely incapable* of doing so.

26. I believed that this was a *reasonable* modification to their policy. As I explained in the discovery request, "That way, [the defendants] are still fulfilling [their] mission; [the defendants] are still providing vocational assistance to disabled Arkansas citizens; nobody who was previously eligible for benefits would no longer get the benefits. Instead, you would merely be expanding the number of people who would get those benefits." Indeed, I am not even asking the Defendants to abolish Eligibility Requirement No. 3 altogether; I am merely asking them to *expand* the number of applicants who would qualify. Now, if I were asking them to abolish Eligibility Requirement No. 1 – the requirement that you must have a disability to qualify – then I admit that would "fundamentally alter" the nature of the service provided. But relaxing the standards of Eligibility Requirement No. 3 does not fundamentally alter the service provided.

27. The question is ... which party holds the burden of proof? Do I have to prove that this modification is reasonable, or do they have to prove that the proposed modification is not reasonable?

28.     The Defendants hold the burden of proof. Multiple binding precedents repeatedly state in no uncertain terms that the public entity has the burden of demonstrating that a proposed modification to their policies would fundamentally alter the nature of their service, program, or activity.

- See Monette v. Electronic Data Systems Corp., 90 F.3d 1173, 1184 (6th Cir. 1996):

    "[I]f a disabled individual is challenging a particular [eligibility] requirement as unessential, the [Defendant] will bear the burden of proving that the challenged criterion is necessary."

- See also Olmstead v. LC, 527 US 581, 591 (1999)

    "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, *__unless the public entity can demonstrate__* that making the modifications would fundamentally alter the nature of the service, program, or activity."

- See also Pottgen v. MO St. High Sch. Activities Ass'n, 40 F. 3d 926, 932 (8th Cir. 1994)

    "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, *__unless the public entity can demonstrate__* that making the modifications would fundamentally alter the nature of the service, program, or activity."

- See also Koester v. Young Men's Christian Ass., 855 F. 3d 908, 911 (8th Cir. 2017)

    "Furthermore, discrimination includes the failure to make reasonable modifications in policies, practices or procedures necessary to accommodate disabled individuals, unless doing so would fundamentally alter the nature of the service."

- See also Alsbrook v. City of Maumelle, 184 F. 3d 999, 1009 (8th Cir. 1999)

    "Only if *__a state can demonstrate__* that modifications would "fundamentally alter" the nature of the service, program, or activity, could a court uphold the state's policy."

- See also DeBord v. Ferguson-Florissant, 126 F. 3d 1102, 1105 (8th Cir. 1997)

    "Title II regulations require a public entity to "make reasonable modifications in

policies ... when the modifications are necessary to avoid discrimination on the basis of disability, ***unless the public entity can demonstrate*** that making the modifications would fundamentally alter the nature of the service."

- See also Roberts v. KinderCare Learning Centers, Inc., 86 F. 3d 844, 846 (8th Cir. 1996)

"A public accommodation must ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, ***unless the entity can demonstrate*** that taking such steps would fundamentally alter the nature of the ... service[s] ... being offered or would result in an undue burden."

29.     So as you can clearly see, the Defendants hold the burden of proving that "likelihood of success in the workforce" is in fact essential to their service.

30.     The Defendants have offered zero evidence to fulfill this burden of proof. See **Undisputed Fact No. 4**. In fact, the Defendants have scoffed at the very idea of having to alter their own policies (see **Exhibit 2, Answer to Interrogatory No. 2**). As the Defendants themselves have argued in this case, "[the opposing party]'s beliefs are not evidence." See **Doc. 85, p. 4**.

31.     Therefore, because the Defendants have offered absolutely no evidence whatsoever to show that Eligibility Requirement No. 3 is in fact an *essential* eligibility requirement, I am entitled to judgment as a matter of law on this issue.

32.     At that point, even if the Defendants could show that I fail to meet the requirement of "likely to succeed in the workforce," it does not matter. I do not have to meet that requirement if it is not an essential one. I am still entitled to judgment as a matter of law on the question of whether I am a "qualified individual with a disability."

33.     Assuming without conceding that I hold the burden of proving that a modification to their policies would not fundamentally alter the nature of the service, that begs the question ... would it fundamentally alter the nature of the service? The answer is, unquestionably, no.

34.     By removing the requirement that an applicant must be "likely to succeed in the work-

force," the ARS is still providing education and career training to disabled citizens of Arkansas. If anything, removing this requirement would merely *expand* the scope of citizens who would be eligible for ARS's services! "This is exactly what the ADA requires." *PGA Tour,* supra at 690. It is not like anyone who was previously eligible for ARS benefits would no longer get them!

35. Alternatively, removing the requirement that the applicant have a disability at all would indeed fundamentally alter the service. At that point, the State of Arkansas would essentially be handing out free college education for everyone, indiscriminately. While the State would certainly have the right to enact such a policy if they were so inclined (indeed, 2016 Presidential candidate Bernie Sanders pledged that very thing if he were elected President), that is clearly a very different social service than what the ARS is supposed to provide. Thus, they would not be required to modify their policies if the proposed modification would effectively turn them into that.

36. However, the Defendants' eligibility requirement that the applicant not only must be *willing* to obtain an employment outcome, but must be "likely" to succeed, does not appear to serve any fundamental purpose to the ARS's mission. At best, it would be classified as a peripheral requirement, but realistically, it does not appear to be even so much as be a peripheral requirement; rather, just seems to be a wild card the Defendants can play whenever they do not want to give a disliked applicant any benefits but cannot come up with any other excuse to do so.

37. Even if another potential use for this policy may hypothetically exist, the Defendants are unquestionably using that eligibility requirement in this case (the only case that matters at this exact moment in time) as such a wild card. They refused to examine me personally, based their determination exclusively on the *existence* of a handful of symptoms, and then made the argument that their determinations are impervious to judicial review![1]

---

[1] In their own Motion for Summary Judgment, they argued "the determination of whether an individual is likely to succeed in the workforce is solely at the discretion of the ARS." By making this argument in the context of a Motion for Summary Judgment, as opposed to

38.    So even if the Defendants can articulate a hypothetical purpose this eligibility requirement may serve, they still should not be permitted to use it here, since they are clearly acting with bad faith and unclean hands in the instant case.

### Sub-Section 2: The Defendants' eligibility requirement is unfairly vague

39.    This is additional evidence that the eligibility requirement that I must be "likely to succeed in the workforce" is just being used by the Defendants as a wild card to allow themselves to deny benefits to whoever they want is the fact that the eligibility requirement does not even have any clear and objective criteria to be met.

40.    First of all, what exactly counts as "success" in the workforce? Does "success" mean I routinely earn raises and promotions in the workplace? Or do I simply have not not get fired? If I have to routinely earn raises and promotions, then how frequently must I earn them? If I need only not get fired, then how long must I continuously hold that job before I am classified as "successful in the workforce," and how soon after graduating college must I be hired?

41.    If I merely need to not get fired to be considered "successful," then does it count against me if my termination is itself a blatant act of disability discrimination? This is probably the most important question of all; after all, the Defendants argue that it is in fact my symptoms caused by my disabilities which make me unable to succeed in the workforce! So does that still count even when the employer is himself acting in violation of federal ADA law?!

42.    What if I wanted to branch out with an independent business? For it to be "successful," do I have to make a particular minimum quota of profit each quarter? Or do I just have to not go bankrupt? If it is the former, how much profit must I make? If I need only stave off bankruptcy, then how many years must the business stay in business before it is classified as "successful?"

_____
arguing their case to a jury, they are essentially claiming that the federal court has no authority to override or sit in review of their decisions, no matter how contrary to the weight of evidence they may be.

43.     But even if we could create a clear and objective definition of what constitutes "success," we still have to create a clear and objective definition of "likely."

44.     Does "likely" to succeed mean I have to have a greater than 50% chance of being successful (however we define that word), or do I have to have a 100% chance of succeeding? In other words, does the slightest possibility that I may not be successful mean I am ineligible for ARS services? Alternatively, is my likelihood dictated by something other than a percentage?

45.     The fact that these very pertinent questions about ARS's eligibility requirements have absolutely no answers to them is yet another indication that this eligibility requirement is merely in place, not to ensure any efficient and impartial spread of funds, but to do the complete opposite; it is designed to give ARS carte blanche to shape the definitions and scope of their eligibility requirements into whatever they want.

### Sub-Section 3: Eligibility Requirement No. 3 is inherently discriminatory.

46.     The Defendants maintain that they did not deny my application because of my disabilities, but rather, because I was "ineligible." However, the eligibility requirement they say I do not meet is ... that my symptoms make me unlikely to succeed in the workforce. In other words, my shortcoming is ... being *too disabled*!

47.     Isn't that kind of like saying that a person is "too black to qualify for affirmative action?!"

48.     At least in the case of *PGA Tour v. Martin*, the Defendants' walking requirement was designed to strategically induce fatigue in the athletes. Casey Martin's impediment was an unfortunate but still completely unintentional side effect of the walking requirement. But as I demonstrated above, even that was not good enough in the eyes of the law.

49.     Here, the Defendants do not even so much as have that excuse. Eligibility Requirement No. 3, on its face, purports to do nothing other than exclude the really egregiously disabled.

50.     That IS discrimination! That is prima facie discrimination! At this point, for the

Defendants to argue that my application was denied because I was "found to be ineligible" is the

equivalent of an employer saying "We didn't refuse to hire the applicant because he was black;

we refused to hire him because he failed to meet all of our job requirements ... one of which is

'not being black.'"

51.     So I now repeat the arguments I made the past two sub-sections: Unless this eligibility

requirement serves, not just a legitimate purpose, but an *essential* one (and no, avoiding a minor

inconvenience does not count as an essential purpose), the Defendants simply have no right to

hold me to that eligibility requirement and that is simply all there is to it.

### Sub-Section 4: The Defendants' expert testimony is inadmissible.

52.     The Defendants base their entire defense on the fact that Leslie Johnson issued the

recommendation that I was not likely to succeed in the workforce. Without that, the Defendants

have no leg to stand on. Without that, the Defendants simply denied my ARS application because

of my disabilities and statutorily protected activities, without any justification. Without her

expert testimony, they do not even so much as have the excuse that I am "unlikely to succeed in

the workforce."

53.     I am filing a Daubert Motion to Disqualify Leslie Johnson along with this Motion. I

believe it would be prudent to rule on that motion before ruling on any of the currently-pending

motions for summary judgment, since that motion requests relief that has serious implications in

this case.

### Sub-Section 5: The reasonableness of the accommodation

54.     Moreover, the "qualified individual" inquiry does not end even if the Court accepts

Defendants' contentions that 'likelihood of success in the workforce' is an essential requirement

for obtaining benefits from ARS *and* that I failed to meet that requirement. The Defendants must provide reasonable accommodations and modifications in policies. In other words, "by the express word of Congress, it is not necessary for a person to meet all eligibility requirements. Instead, if a proposed modification of those requirements is reasonable, a person can be a qualified individual." See Pottgen v. Missouri St. High Sch. Activities Ass'n, 40 F. 3d 926, 932 (8th 1994).

55.     I have proposed the accommodation of being granted funds to begin college while simultaneously attending therapy. See Undisputed Fact No. 9. Amy Jones stated that she does not find that to be a reasonable accommodation. See Exhibit 11, ¶ 33.

56.     So the question is … who holds the burden of proving whether a proposed accommodation is reasonable? The Defendants do.

57.     Numerous published court opinions from the Eighth Circuit make it abundantly clear that I am only required to *propose* an accommodation, and then the burden shifts to the Defendants to prove that the proposed accommodation is unreasonable.

- See Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir.1995)

    "[O]nce the plaintiff makes a facial showing that reasonable accommodation is possible, the burden of production shifts to the [Defendant] to show that it is unable to accommodate the [plaintiff]."

- See also Mason v. Frank, 32 F. 3d 315, 319 (8th Cir. 1994)

    "[Plaintiff] did, however, present evidence sufficient to make a facial showing that he could [meet the eligibility requirements] with reasonable accommodations … The burden therefore shifted to the Postal Service to present credible evidence that it could not reasonably accommodate Mason."

- See also Wood v. Omaha Sch. Dist., 985 F.2d 437, 439 (8th Cir. 1993)

    "In a Rehabilitation Act case, plaintiffs must initially meet the burden of providing evidence sufficient to make at least a facial showing that reasonable accommodation is possible. [Plaintiffs] Wood and Whitcomb have ***met their***

***burden by proposing*** [an accommodation]. The burden then shifts to defendants to prove that they are unable to accommodate the plaintiffs or that the proposed accommodation is unreasonable." (emphasis added)

- See also Gardner v. Morris, 752 F. 2d 1271, 1280 (8th Cir. 1985)

"After a plaintiff produces sufficient evidence to make at least a facial showing that reasonable accommodation is possible, the regulations require that the [Defendant] bear the burden of proving inability to accommodate."

- See also Arneson v. Heckler, 879 F. 2d 393, 398 (8th Cir. 1989)

"[T]he plaintiff is required to produce sufficient evidence to make at least a facial showing that reasonable accommodation is possible. Then the burden shifts to the defendant to show that reasonable accommodation is not possible."

58.     There is no way around it. I have fulfilled my burden of proof merely by *proposing* an

accommodation. Then the burden of proof shifts to the Defendant to show that the

accommodation is not reasonable. The Defendants have come forth with abso-lutely no evidence

whatsoever to meet this burden of proof. See **Undisputed Fact No. 10**. Therefore, their defense

must fail.

59.     As I stated in the Statement of Undisputed Facts, ¶ 34 of Amy Jones' affidavit might have

been an attempt after all by Amy Jones to create some semblance of legitimacy behind her

determination that my proposed accommodation was not reasonable.

60.     This paragraph states, in pertinent part, the following:

"In December 2015, I felt that the provision any ARS services to David would potentially jeopardize the safety of any ARS vendor paid to provide services. I felt that David's untreated mental health and instability could be further aggravated / worsen given the stressors of college training, employment, or any involvement with the public at his current mental state, and the risk for David to cause harm to himself or others was too great a risk to take."

61.     If that was indeed the Defendants' attempt to justify why my proposed accommodation is

reasonable, then it would be classified as the "direct threat" exception. This is indeed a valid

excuse for failure to accommodate that is recognized at law. Chevron USA Inc. v. Echazabal, 536

US 73 (2002) states in pertinent part ...

> "[T]he [Americans with Diabilities] Act creates an affirmative defense for action under a qualification standard shown to be job-related for the position in question and ... consistent with business necessity. Such a standard may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace, if the individual cannot perform the job safely with reasonable accommodation. By regulation, the EEOC carries the defense one step further, in allowing an employer to screen out a potential worker with a disability not only for risks that he would pose to others in the workplace but for risks on the job to his own health or safety as well."
> See Id at 78 (citations and quotations ommitted).

62. That, however, changes nothing. The Defendants still unequivocally hold the burden of proof on this defense. See EEOC v. Wal-Mart Stores, Inc., 477 F. 3d 561, 572 (8th Cir. 2007) ("we now hold that the [defendant] bears the burden of proof, as the direct threat defense is an affirmative defense").

63. The only evidence the Defendants even arguably have to support their contention that attending college would only aggravate my existing symptoms is ... the fact that I have the symptoms at all. By the Defendants' own admission, they never examined me personally. See **Exhibit 3, Answer to Requested Admission No. 8**. Instead, by the Defendants' own admission, they merely noticed the symptoms listed in my medical records, and made their decision just on that alone. See **Doc. 16, p. 9**: "these symptoms are illustrative of why Stebbins could not ... succeed in the workforce." See also **Doc. 85, p. 16** (same). See also **Doc. 110, p. 18** (same).

64. Binding precedent clearly states that this is not allowed. See School Bd. of Nassau Cty. v. Arline, 480 US 273, 287 (1987).

> "The remaining question is whether Arline is otherwise qualified for the job of elementary schoolteacher. To answer this question in most cases, the district court will need to conduct an individualized inquiry and make appropriate findings of fact. Such an inquiry is essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks."

65.     So what exactly counts as an "individualized inquiry?" Exactly how much personalized investigation must be conducted before the Defendants have fulfilled their duty? Well, we know at least this much: Entities bound by the ADA and Rehabilitation Act cannot simply say the mere *existence* of X, Y, or Z symptoms, alone, without more, creates a threat. That much has been unequivocally stated by the Supreme Court to be insufficient.

66.     And yet, by the Defendants' own admission, that is exactly what they did.

67.     Therefore, because they have no evidence to support their belief that my proposed accommodation is reasonable (whether because they cannot provide it or because I pose a direct threat), I am entitled to judgment as a matter of law on the question of whether I am otherwise qualified.

68.     However, although the presence of symptoms, alone, is not enough to justify the affirmative defense of direct threat, *actual threatening statements* are. It is at this point we must now turn to ...

### Sub-Section 6: Threatening statements are inadmissible due to hearsay.

69.     After the Defendants' Motion to Dismiss was denied (but not before then), the Defendants attempted to create some brand new excuse to justify their decision to deny me funding. They attempted to argue that I had engaged in hostile interactions with ARS staff while my application was still pending.

70.     In addition to these accusations being complete lies in the first instance, they cannot produce any evidence in support of these accusations anyway. The declarants of these statements are Lorraine Miller, Caterina Matheny, Alana Walls, and an anonymous writer. None of these declarants were listed as witnesses in this case. Therefore, any testimony or evidence about what they heard or saw is hearsay.

71.     The evidence phase of this case is now over. Therefore, it is too late for the Defendants to introduce new witnesses. If they call any witnesses except Amy Jones, Leslie Johnson, or Kevin Cook, then they are calling surprise witnesses, and that is a flagrant violation of my right to discovery.

72.     I plan on filing a Motion in Limine to this effect, once March 16 comes and my motion will no longer be premature under the Court's current scheduling order. I will argue that they should be precluded from making the accusation against me in Court, since they would be prohibited from offering any evidence in support of the accusation. This Court would have to sustain that objection anyway. So it is already a foregone conclusion.

73.     Therefore, if the Defendants will not be permitted to introduce evidence of any hostile behavior at trial, they will just lose that dispute at trial. So we may as well just issue summary judgment here and now. Why delay the inevitable?

74.     The Defendants have no admissible evidence that I yelled at or threatened any of their officers. Therefore, they cannot prove that this also played a role in their decision to my application. Therefore, I am entitled to judgment as a matter of law on this disputed fact.

## SECTION IV: WHY DELAY THE INEVITABLE?

75.     The argument I just made about them not being allowed to produce this evidence at trial also applies to the other two arguments I seek summary judgment on.

76.     Since discovery is now over, it is too late for the Defendants to introduce new evidence to show that "likelihood of success in the workforce" is in fact an essential eligibility requirement for ARS services, or that altering this requirement would fundamentally alter the nature of ARS services.

77.     Therefore, just like with the hearsay accusations of hostile behavior, the Defendants

should be precluded from offering nay evidence in support of these positions at trial, because to do so would be a violation of my discovery rights.

78.     This means that they will inevitably lose at trial. Therefore, we should go ahead and issue summary judgment here and now, just to avoid wasting the federal courts' (and Co-Defendant State of Arkansas') time and money.

## SECTION V: RELIEF AND DAMAGES

79.     So I am entitled to judgment as a matter of law on the tort of Title II disability discrimination. The only question is … what should I get in order to make me whole?

### Sub-Section 1: Injunction to pay for college

80.     First, I ask for the State of Arkansas, the ARS, and Amy Jones to all be ordered to reverse their decision and approve my application for college funding.

81.     I ask that they be ordered to pay all of my college expenses in the first instance that I cannot obtain from FAFSA, scholarships, or other traditional college funding methods. After all, as I stated in my Complaint and Jury Demand …

> "All students who qualify at all are eligible to receive at least $5,300 per year ($5,000 per year for tuition/room/board and $300 for textbooks) in grants that do not have to be repaid, but the ARS can provide extra funds for extenuating circumstances, at the manager's discretion, with no maximum amount of funding"

82.     This is proven beyond genuine dispute. See Undisputed Fact No. 11. I have requested additional funds to fund my entire college education. See Undisputed Fact No. 12.

83.     However, the Defendants have already shown that they cannot be trusted to evaluate my applications impartially. If they are to be ordered to grant my application, that should include the extra funding for the extenuating circumstances I mentioned in Paragraph 7 of the "Complaint and Jury Demand."

84.     That means that they should be ordered to pay for ALL my college expenses, minus any

additional monies I may or may not be able to acquire otherwise, such as through pell grants.

85.     I ask that this not be treated as damages. We have no way of knowing what the tuition will be in future academic years. Even *next* year's tuition has not yet been published by any respectable 4-year university (if indeed they have even decided on it yet). By ordering them, via an injunction, to pay those costs, whatever those costs may be, I am protected from the risk of tuition going up higher than anticipated.

## Sub-Section 2: Injunction to Cease and Desist

86.     I also ask this Court to issue an additional injunction to the *entire* State of Arkansas. This injunction should order them to never again use my disabilities or symptoms as a factor in any adverse action taken against me.

87.     This injunction should apply to the entire State of Arkansas.

## Sub-Section 3: Compensatory Damages

88.     Compensatory damages are permitted when the Defendant acts with a discriminatory intent. See Meagley v. City of Little Rock, 639 F. 3d 384, 387-390 (8th Cir. 2011).

89.     Discriminatory intent is unquestionably proven in this case. The Defendants, by their own admission, they declared me ineligible for ARS funding almost entirely because of my symptoms and disabilities. They have offered no evidence whatsoever to show that "likelihood of success in the workforce" is an *essential* eligibility requirement, and they have not even *attempted* to offer any evidence that my disabilities cannot be accommodated.

90.     They did it because they expected to get away with it. They argued during their Motion to Dismiss that they were above the law. See Doc. 16 ("the determination of [eligibility] is solely at the discretion of the ARS"). They did not do it because the discrimination was only an unintended side effect of an otherwise legitimate, good faith policy. They did it because they

believed they *could*.

91.     As I have demonstrated, my lost wages in this case is $89,685.71 per year, or $1,724.73 per week. See Undisputed Fact No. 13. Therefore, I hereby request compensatory damages of $1,724.73 per week, starting from December 17, 2015 and lasting until I begin college at ARS's expense per the injunction requested in Sub-Section 1.

### Sub-Section 4: Punitive Damages

92.     I also have the right to recover punitive damages in this case. Sec. 203 of the Americans with Disabilities Act – which governs the remedies and penalties for a violation of Title II thereof – states that the remedies and penalties are the same as those for employment discrimination under the Rehabilitation Act. Employment discrimination allows the recovery of punitive damages, and therefore, they are also recoverable in this case.

93.     I therefore request punitive damages of four times the compensatory damages. That comes out to $6,898.92 per week, starting at December 17, 2015 and continuing until I begin college at ARS's expense per the injunction requested in Sub-Section 1.

### SECTION VI: CONCLUSION

94.     In Conclusion, the Defendants have offered absolutely zero evidence in support of their positions and therefore should lose. They probably believed that they were in the clear, since they probably assumed I would hold the burden of proof on all factual disputes. They were wrong in that assumption. However, the mere fact that they did not realize they held the burden of proof does not excuse their failure to meet that burden; after all, as the saying goes, *ignorantia juris non excusat*. Therefore, I am entitled to judgment as a matter of law.

95.     Wherefore, premises considered, I respectfully request that summary judgment be entered in my favor on the claim of Title II disability discrimination, the Defendants be ordered to

approve my application and pay for all of my college expenses in the first instance, that they be ordered to pay me compensatory damages of $1,724.73 per week, retroactively starting at December 17, 2015 and lasting until I enroll in college, award costs incurred, and any other relief to which I may be entitled.

So requested on this, the 29th day of December, 2017.

David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com