UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF ARKANSAS

DAVID A. STEBBINS                                                    PLAINTIFF

VS.                        CASE NO. 3:17-cv-03092

STATE OF ARKANSAS, ARKANSAS
REHABILITATION SERVICES, AND AMY JONES                DEFENDANTS

## AFFIDAVIT OF DAVID STEBBINS

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following affidavit in the above-styled action.

1. On December 1, 2015, I entered the Harrison office of Arkansas Rehabilitation Services and met iwth ARS Counselor Kevin Cook.

2. During his meeting, I completed an application for services, in which I stated I was seeking assistance with attending Arkansas Tech in Russellville.

3. I did not say he was against me as soon as I sat down. I did my absolute best to cooperate wtih him and answer his questions. However, he was not very clear about what he wanted me to say. Cook mentioned that I am supposed to apply for Pell Grants, FAFSA, etc. When I explained htat I could not do that, he said that the ARS has the discretion to increase the financial assistance beyond the traditional $5,300 with no upper cap under special circumstances.

4. I brought 13 pages of medical records from St. Bernard's with me to the interview.

5. ARS faxed records requests to Dr. Victor Chu and Dr. Robert Frenal's offices on 12/01/15.

6. On December 3, 2015, I emailed Kevin Cook at 10:50a.m., asking about the status of his application. I was not angry, yelling, cussing, or anything else suggesting a lack of mental instability.

Exh. 1

7. On December 4, 2015, I called the ARS office in Fayetteville to try and check up on the status of my application, since I was told by the Harrison Office that Kevin Cook was in Fayetteville that day. I had to use my landline for the call because my Skype was not working at the moment, which irritated me in a way the ARS had nothing to do with. I asked to speak with a supervisor. I was transferred to somebody named MIller. I asked her to call me back so I would not have to continue to pay by the minute for long distance, and Ms. Miller complied.

8. On Monday, December 7, 2015, Kevin Cook responded to my email and informed me that clinics have up to 60 days to comply with the request for records.

9. On Tuesday, December 8, 2015, I called ARS around 2:20 p.m., and spoke with Administrative Assistant Maghee. I did my absolute best to maintain my composure and be patient with them. I asked to speak to Kevin Cook. I was transferred to someone other than Kevin Cook, named Caterina Matheny. She informed me that they had not received the medical records. I asked who had not provided the information, so I could contact them myself. I was told that it was Crossroads Medical Clinic. I called them and asked why they had not complied with the request for records, but they hung up on me. I tried to call them multiple times, but the same results happened, over and over again. So at 3:20PM, I decided to contact ARS again and ask them for assistance. I did not yell at the ARS during this call. I was forwarded to Alana Walls for help. Walls merely told me that the ARS "needed medical documentation." I tried to explain to her that I was trying to get the documetnation for her, but that was precisely what I needed help with: getting the clinic to cooperate. I did not yell at her. I was not verbally abusive.

10. I have no idea on what they are basing their belief that refused to provide the medical records. I provided them at every stage whenever I was told that I needed to. If they did not tell me that I needed the medical documentation, then I do not believe it is fair that I should be

expected to magically know when they need the medical records without them having to tell me. When they *did* tell me that they needed the records, I provided them in a timely manner. I do not understand what their basis is for saying that I refused to cooperate with their requests for medical records.

11.  Amy Jones later called me. However, I never said in that call that I hated the ARS simply by reason of them being "the government." Jones answered some of my questions, but there were still a few she refused to give straight answers on. Namely ...

   a.  How long does processing the application take?

   b.  Is there anything I could do to help expedite the application processing?

12.  During this call, I never once yelled or cussed at her, never once called a "fucking bitch faggot," and I never once said that I cannot control my anger.

13.  Amy Jones promised to call me back the next day, but she never did.

14.  Jones asked me about my past college experience. I explained that I was in the U of A for a semester. However, i was not thrown out for making threats. I was thrown out because they misconstrued something I said as a threat. I then enrolled in North Arkansas College and was able to thrive there, completing most of my semesters, once I had reasonable accommodations for my disability. Sure, I withdrew from some classes, but I sitll completed most of my semesters.

15.  I withdrew from the majority of my classes during the Fall 2009 and Spring 2010 semesters. However, that was not because I could not handle the stressors of college training. I had decided that I wanted to change my major about halfway through the Fall 2009 semester. That is why I withdrew from all but one of my Fall 2009 classes. In the Spring 2010 semester, the classes I needed to take for my new major were not offered, as they were offered exclusively

in fall semesters. So to avoid dropping below half time and losing my eligibility for FAFSA, I enrolled in two completely random classes - Botany and Sociology - to serve purely as placeholders. These two classes served no purpose towards my major; they were designed exclusively to prevent me from entering financial default on my Pell grants and Stafford loans.

16. I withdrew from those two classes as well, but that was not because I simply could not handle the stressors of college training. The reason I withdrew from them is because I then learned about another method to avoid financial suspension so I could have FAFSA again in the Fall 2010 semester when I began my new major. I was told by my admissions counselor at the time – one Kim Brecklein by name – that, if I took just a single class in the summer semester out-of-pocket, then I'm instantly off financial suspension automatically. No other conditions would have to be met.

17. Once my admissions counselor unequivocally confirmed that for me, then, and only then, did I withdraw from these two classes that didn't even matter to begin with. In the Summer 2010 semester, I enrolled in a single class - Aerobics - and completed that course with an A to remove my financial suspension.

18. However, when I attempted to transfer to another school for my new major, my admissions application never got completed. To this day, I still do not know exactly what went wrong. But the bottom line is, I was not able to enroll in that class and therefore went right back on financial suspension.

19. I have no idea what the Defendants are basing their claim that I was "unable to complete most of my semesters" on. As I have hopefully demonstrated just now, that is simply untrue, and their belief to the contrary seems to be caused by, at best, their refusal to actually communicate with me.

20. Upon discharge from St. Bernard's in April 2015, I was told, as part of my discharge, to attend a single, lone session at Health Resources of Arkansas in Harrison. I was not supposed to attend any sessions beyond that.

21. I attended that one, lone session as ordered by Dr. Weeks.

22. I have no idea what the Defendants are basing their claim that I refused to attend therapy on. I clearly did go to the therapy session as per ordered. They appear to believe that I was asked by Dr. Weeks to enroll in regular out-patient therapy sessions. That is not accurate. I was only suspposed to go to one session and that was it. I was not supposed to go to any more. I did exactly what I was asked to do.

23. Dr. Leslie Johnson issued a report and recommendation that my "symptoms" that were recorded in my St. Bernard's discharge papers could potentially interfere with my vocational rehabilitation, and recommended denial of my application just for the possibility of me being unlikely to succeed in the workforce. She also mentioned that I had filed several civil rights and discrimination lawsuits, and suggested that I be denied ARS funding for that reason, too.

24. In forming this recommendation, Dr. Johnson based her opinion exclusively on reading my medical records and noticing a list of symptoms that she could use as fodder to recommend denial. She never once examined me personally, let alone determined that these symptoms were indeed severe enough that I could not hold a job.

25. Amy Jones adopted Dr. Leslie Johnson's recommendation, verbatim, including the references to my statutorily protected activities, as the primary reason for denying me ARS funding. She sent me a letter on December 17, 2015, informing me of the decision. At no point during this 1-page letter does she ever mention, or even hint at, any alleged behavior I exhibited during any phone calls or interviews. I never received any notice in the mail from ARS that my

application had been denied prior to receiving this letter. The two-page document the Defendants profer as ARS 122-123 is a document I had never seen prior to the filing of this lawsuit.

26. I asked Disability Rights, Arkansas to request on my behalf all the documents and evidence that were used by the ARS to reach that determination. In response to this request - the request to produce absolutely everything that was even a slight factor in their decision - the Defendants attached only a signle, two-page document: Dr. Johnson's recommendation spoken of in Paragraph XX of this affidavit. That's it. Nothing else was attached. Therefore, this one document was the sole determining factor in the ARS's adverse actions.

27. When I saw the reference to my litiation history, I was at least a little hesitant to continue to file suit. I feared that, if I continued to file lawsuits, the government would only continue to persecute, harass, and badger me. I ultimately decided that I needed to continue to stand up for myself or else they would only be further encouraged to continue harassing and badgering me, but I certainly had at least some hesitation.

28. To collect the evidence that I was indeed capable of thriving in college with my disabilities, I enrolled in a single class at North Arkansas College in the Summer II, 2016 semester. I paid for this class out of pocket. I took English Composition II under instructor Rachel Lanning, since NAC only offered ten (10) classes during that semester, and this was the only class offered at the time that was even arguably applicable to my intended major of computer science. English was my worst subject in high school. Despite this being my worst subject, I made a "B" in this out-of-pocket class. Also, I had a perfect attendance record for that class, being present for 19 out of 19 class sessions (although we were originally scheduled for 20 class sessions, the penultimate day was canceled after everyone in the class agreed in advance to cancel the class). This also proves that I had no major disciplinary problems during that class, since if I did, I would have

been asked to leave the class, which would have counted as an absence. Since there are no absences to account for, that means I had no major disciplinary problems.

29. I filed suit against the Defendants for disability discrimination, ADA retaliation, and First Amendment Retaliation. The Defendants moved to dismiss, arguing that they are above the law, that they are the only ones who get to decide whether I am likely to succeed in the workforce, even if they have no evidence outside of their arbitrary and baseless assumptions that are devoid of any extrinsic evidence.

30. This motion to dismiss was denied by Judge Moody of the Easter District of Arkansas, adopting verbatim a Magistrate Judge's Recommended Partial Disposition stating, among other things, the Defendants' unilateral approval is not an essential eligibility requirement for any public benefit, and the Defendants' determinations regarding my lack of ability are not sacrosanct, like they believe.

31. As we conducted discovery, the Defendants requested an additional 30 days to respond to my first discovery request. I realized then that they were forging a number of documents and needed more time to put the final touches on these forgeries.

32. When I finally got the responses to the discovery requests, they contained numerous references to never-before-heard-of hostile interactions with ARS staff. This was the first time, literally since Day 1 when I first applied for ARS funding, that the ARS had made even the slightest mention of any behavior problems, let alone stated that they were factors in the adverse action.

33. I asked the Defendants to tell me the names, addresses, phone numbers, and email addresses of each witness they plan to call in this case. They told me about three witnesses: Amy Jones, Leslie Johnson, and Kevin Cook. They stated that they would update this list as new

witnesses became available. However, I never received any updates to the witness list.

34. I requested electronic copies of the documents the Defendants typed up as part of my application file. I wanted to search the files for metadata – in particular, the revision history of the files – to prove beyond a shadow of a doubt that the documents had indeed been tampered with. When I got the computer files, sure enough, there was evidence that one of the documents has had its revision history purposefully removed by Christine Cryer. I am filing a "Motion for Adverse Infererce" in this cation. I defer the Court to its contents.

35. The Defendants have denied me public benefits solely on the unfounded fear that some of my symptoms *could* interfere in some vague way with my vocational success. They did not examine me personally because my litigation history meant that they did not like me. They deserve to be punished.

_____
David Stebbins

## ACKNOWLEDGEMENT

On this day before the undersigned, a Notary Public, duly qualified and acting in and for the County and State aforesaid personally appeared **DAVID A. STEBBINS**, known to me or satisfactorily proven, whose name appears as AFFIANT in the foregoing instrument, and stated that he/she had executed the same for the uses and purposes therein stated.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this **EIGHTEENTH** day of **DECEMBER, 2017**.

Notary Public: Tammy King

My Commission expires: June 30, 2021

Seal:

[Notary Seal: STATE OF ARKANSAS, TAMMY KING, NOTARY PUBLIC, COMM. No. 12382832, My Comm. Expires June 30, 2021, BOONE COUNTY]