US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

JAN 0 2 2018

DOUGLAS F. YOUNG, Clerk
By

Deputy Clerk

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF ARKANSAS

DAVID A. STEBBINS                                                    PLAINTIFF

VS.                         CASE NO. 3:17-cv-03092

STATE OF ARKANSAS, ARKANSAS
REHABILITATION SERVICES, AND AMY JONES          DEFENDANTS

## BRIEF IN SUPPORT OF RESPONSE IN OPPOSITION TO
## [109] MOTION FOR SUMMARY JUDGMENT

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following Brief in

Support of my Response in Opposition to Doc. 109, the Defendants' Motion for Summary

Judgment.

### SECTION I: PRELIMINARY MATTERS

1.       Before we continue, I wish to remind the Court of the limitations on its power. Since I am

limited to 25 pages for this Brief, I will simply defer the Court to Paragraphs 1-6 of the

"Response in Opposition to Motion for Summary Judgment" that is being filed simultaneously

with this Brief. Please keep that in mind while reviewing this Brief.

2.       With that said, on with the Brief.

3.       The Defendants' Motion should be denied for a variety of reasons.

### SECTION II: EXHAUSTION OF ADMINISTRATIVE REMEDIES

4.       The Defendants argue that I have not exhausted my administrative remedies, and

therefore, my claims are barred as a matter of law.

5.       In support of this legal argument, the Defendants do not offer even one single solitary

legal authority that actually comes from Congress, the U.S. Department of Justice, the Supreme

Court, or the Eighth Circuit Court of Appeals. Instead, the Defendants cite copious amounts of

*Arkansas State* case law, all of which carry zero weight in federal court proceedings. The

Defendants may as well be citing case law from a completely different country.

6. Granted, the Defendants' preferred legal citations can certainly serve as *persuasive* precedent. However, persuasive precedent only helps if there is no binding precedent directly addressing the matter. In this case, however, there is.

7. Earlier this year, the Eight Circuit Court of Appeals issued its first clear precedent on the question of whether a Plaintiff is required to exhaust administrative remedies before filing suit in federal court for a violation of Title II of the Americans with Disabilities Act.

8. In the case of JM v. Francis Howell School District, 850 F. 3d 944 (8th Cir. 2017), the Eighth Circuit Court of Appeals stated that a plaintiff is only required to exhaust administrative remedies if the adverse action that caused the injury is equally cognizable under the Individauls with Disabilities Education Act (or IDEA, for short). See *id* at 947:

> "The IDEA's exhaustion requirement also applies to claims under the Constitution, the ADA, the Rehabilitation Act, and other federal laws protecting children with disabilities to the extent those claims seek relief 'that is also available under [the IDEA].'"

9. However, they go out of their way to make it clear that ...

> "exhaustion is not necessary when the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee — what the Act calls a `free appropriate public education.'" See *id* at 948.

10. So that begs the question ... does this current case allege a violation that is interchangeable with IDEA? The answer is, undeniably, no.

11. I am currently suing the Defendants for refusing to provide public funding for me to attend college. However, the IDEA, on its face, only applies to institutions that offer *free* public education! In other words, grade school, and *public* grade school at that! The IDEA, on its face, does not apply to institutions of *post*-secondary education. See JM v. Francis Howell School District, supra, at 948 ("The IDEA, of course, protects only 'children' (well, really, adolescents

too))." See also U.S. Department of Education. (2017, September). *Students with Disabilities Preparing for Postsecondary Education: Know Your Rights and Responsibilities*. Retrieved December 8, 2017, from https://www2.ed.gov/about/offices/list/ocr/ transition.html ("Unlike your high school, however, your postsecondary school is not required to provide FAPE").

12.     Even if a requirement to exhaust administrative remedies exists, JM v. Francis Howell School District provides for several exceptions. See *id* at 950. One of them is "the establishment of an agency policy or practice of general applicability that is contrary to law." *Id.* Such is the case here. The Defendants, by their own admission, give themselves the right by state statutes to use literally whatever factors they want when determining whether an applicant is "likely to succeed in the workforce. As they maintain during their brief in support of this very motion ... "the determination of whether an individual is likely to succeed in the workforce is solely at the discretion of the ARS." This squarely constitutes a policy of general applicability that is contrary to law. Therefore, the exhaustion requirement, if one exists at all, is excused in this case.

13.     Therefore, the Defendants' argument that my claim must fail because I did not exhaust administrative remedies is frivolous and should be denied.

## SECTION III: PRIMA FACIE ADA RETALIATION CLAIM

14.     Next, the Defendants maintain that it is proven beyond genuine dispute that the adverse action was not motivated, not even partially, by my statutorily protected activities.

### Sub-Section 1: Defendants' evidence is interested and lacks probative value.

15.     The Defendants' sole evidence in support of this position is the uncorroborated testimonies of two interested witnesses: Leslie Johnson and Amy Jones.

16.     It is one thing to use the uncorroborated testimony of interested witnesses to demonstrate a genuine dispute of material fact. However, with this motion, the Defendants are not merely

arguing that there is a dispute of fact. They are arguing the opposite. They are arguing that their interested and uncorroborated testimonies entitle them to summary judgment.

17.    The Defendants arguments get more and more frivolous by the minute. They are essentially asking the Court to take their uncorroborated word as sacrosanct, deny me the opportunity to cross-examine them at trial, and throw my case out simply because they *claim* to be innocent of retaliation.

18.    It is the subject of great debate among federal courts whether a nonmovants uncorroborated, self-serving testimony is enough to stave off summary judgment See Close, J. (2014, January 16). "Self-Serving Testimony" and Summary Judgment Standards. Retrieved December 8, 2017, from http://apps.americanbar.org/litigation/committees/pretrial/articles/spring2014-0614-self-serving-testimony-summary-judgment-standards.html.

19.    However, the Defendants' current contention that their uncorroborated, self-serving statements not only stave off my own Motion for Summary Judgment (Doc. 79), but actually *entitle them* to summary judgment, is entirely unprecedented in our jurisprudence and has no arguable basis in law.

20.    When reviewing a Motion for Summary Judgment, the District Court must accept all evidence in a light most favorable to the nonmovant. That is such a well-documented legal precedent that I should not even have to provide a citation for it.

21.    This means that the Court must accept the possibility that the Defendants are lying in these affidavits to protect themselves from liability. Although the Defendants are entitled to present their testimony (provided it is still admissible) at trial and allow the jury to weigh the credibility of the witnesses, credibility determinations and weighing of the evidence are expressly forbidden in a motion for summary judgment.

22.     Therefore, Defendants' Undisputed Facts Nos. 85 & 86 still genuinely disputed, simply
by reason of them not being supported with disinterested evidence.

### Sub-Section 2: I have shown sufficient evidence of causal connection.

23.     Although the Defendants' assertion that they are entitled to summary judgment on the
ADA retaliation claim solely because they deny retaliating against me is entirely frivolous,
defendants can, and often do, obtain summary judgment simply on the grounds that the Plaintiff
has not come even remotely close to meeting his burden of proof in the first place.

24.     The Defendants attempt to make some argument to this effect. In their Brief in Support of
Motion for Summary Judgment, they state "It appears he is basing his opinion on the mere fact
that her report contained a mention of the lawsuits and that was it. Stebbins' beliefs are not
evidence." See **Doc. 110, p. 6**.

25.     The report did not merely contain "a mention of the lawsuits and that was it." It was
clearly listed as one of the reasons for her Conclusions and Recommendations.

26.     Think about it ... why else would she mention the litigation history if it did not contribute
in any way, shape, or form? It makes absolutely no sense! It is clear form the structure of that
recommendation that Leslie Johnson is expected to be as brief and abridged as possible.
Anything that is not relevant to her recommendation is not normally supposed to go in there.
Therefore, the fact that my litigation history went in there clearly means that it was a factor in the
recommendation.

27.     A court of competent jurisdiction has already ruled in my favor on this issue. Magistrage
Judge J. Thomas Ray, in his Recommended Partial Disposition, stated the following:

> "Defendants' denial explicitly referred to his litigation history as one of the
> reasons for its decision ... the Court concludes that these allegations are sufficient
> to state a plausible claim [for retaliation] under the ADA." **Doc. 51, p. 15**.

28.     This Recommended Partial Disposition was adopted by then-sitting District Judge

Moody. See **Doc. 55**. Therefore, it is controlling in this case under the doctrine of res judicata.

That is the controlling law in this case unless the 8th Circuit Court of Appeals or the Supreme

Court – and nobody else except those two bodies – determines that the opinion was legally

erroneous.

29.     By finding that I have stated a claim upon which relief can be granted, that means that, if

those facts are proven exactly as I described them, a reasonable jury could make the

determination that the Defendants had retaliated against me. That is what "failure to state a

claim" means.

30.     I have indeed proven the facts listed in my complaint. Even if this Court denies my

currently-pending Motion for Summary Judgment (Doc. 79) on the grounds that the reference to

my litigation history is not sufficient to *prove beyond genuine dispute* that the litigation history

was a factor in the adverse action, it is still sufficient to stave off summary judgment for the

Defendants.

### Sub-Section 3: The Defendants' testimony is implausible and inconsistent with the established evidence.

31.     In an attempt to retroactively[1] justify their decision to include my litigation history in a

way that clearly showed it was a factor in their determination, the Defendants attempt to offer an

extremely convoluted explanation as to why they included the reference. Leslie Johnson states in

her affidavit that (A) she only checked my court history after reading that I was arrested in 2011,

(B) she only wanted to see if I had any currently-pending criminal charges, and (C) she only

mentioned my litigation history as a means of confirming that I indeed had no currently pending

criminal charges.

---

[1]     and I do mean "retroactively."

32.     All three of these statements of fact are completely at ends with the undisputed evidence.

33.     First, her statement that she only checked my court history after reading that I was arrested in 2011 is demonstrably false. Looking at her Recommendation (ARS 85-86), she clearly states that she was inspired to check my court history after reading that I am chronically targeted by corrupt government.

34.     Second, it is impossible that she *only* checked court records to search for evidence of currently-pending criminal charges and nothing more. She would not have found evidence of my civil litigation if that is what she was looking for.

35.     To prove this, I have **Exhibit 3**. See, because she referenced my *discrimination* lawsuit history, that necessarily means that she looked on PACER to find them, since they would not be listed in the state courts' dockets. So to see exactly what happened, I decided to search for my own name and see what kind of search results I came up with. This exhibit is what my search results looked like.

36.     As you can clearly see, the search results clearly listed me as the "Plaintiff" in every search result.

37.     One David Stebbins was listed as the "Defendant." However, the middle initial is clearly shown to be a D, not an A. The Defendants knew full well that my middle name is Anthony. They had a tone of documentation on hand that clearly listed my middle name as being Anthony, some of which has even been included by the Defendants as exhibits to this current motion! See **Defendants' Exhibit B, Page 17** (filemarked as ARS 41) is one page the Defendants themselves have produced that clearly lists my middle name as "Anthony." Meanwhile, Page 54 of that exhibit (filemarked as ARS 83) does not say my full middle name, but clearly lists my middle initial as A in the upper left corner of the page.

38.     So Leslie Johnson knew full well that the only search results that could have been about me in particular had me clearly listed as the "Plaintiff." In other words, they knew these search results were for civil cases.

39.     So despite knowing full well that they were civil cases, Johnson nevertheless proceeded to look at each case individually to see what they were about.

40.     So I ask you … why would Johnson care about the individual nature of the cases if she were only looking for evidence of currently pending criminal charges? If that were all she was looking for, then the mere fact that I was listed as "plaintiff" already puts that concern to rest by itself.

41.     The only explanation that makes even a modicum of sense is … she was not looking exclusively for evidence of currently-pending criminal charges. She may have been looking for that, but she was definitely looking for something else, maybe or maybe not in addition to currently-pending criminal charges. She was probably looking for anything – anything at all – that could be useful in determining whether I was eligible for ARS services at the moment.

42.     This can only mean that she considered my discrimination lawsuit history to be relevant to my ARS eligibility, which is why she included them.

43.     Last but not least, her statement that she only mentioned my litigation history to confirm that she did not find any evidence of currently-pending criminal charges is equally ridiculous. Such a strategy makes absolutely no sense! If all she wanted to do was confirm that there were no currently-pending criminal charges, don't you think it would make a lot more sense if she simply said "there are no records of any currently-pending criminal charges?" Wouldn't that have been so much clearer than referencing statutorily protected activities in a way that clearly indicates that these statutorily protected activities were a factor in her recommendation?

44.     The Court is not required to accept patently implausible claims on a motion for summary judgment. Even if they were attempting to use that excuse to stave off my own Motion for Summary Judgment, the Court is not required to accept patently implausible claims that are wholly unsubstantiated by anything other than the party's uncorroborated word. See Uhiren v. Bristol-Myers Squibb Co., Inc., 346 F. 3d 824, 827 (8th Cir. 2003): "[A] mere scintilla of evidence supporting the nonmovant's position will not fulfill the non-movant's burden." See also Anderson v. Liberty Lobby, Inc., 477 US 242, 252 (1986): "The mere existence of a scintilla of evidence in support of the [nonmov-ant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." But it certainly cannot be used to prove a fact beyond genuine dispute during their own Motion for Summary Judgment!

45.     All the evidence suggests that Dr. Johnson mentioned the litigation history because she intended for it to be a factor in determining my eligibility for ARS funding. The Defendants can deny that fact, but the fact is nevertheless proven beyond genuine dispute in my favor.

### Sub-Section 4: Amy Jones acted with a retaliatory motive when she adopted Leslie Johnson's recommendation.

46.     Amy Jones states that she did not deny my application because of my civil rights litigation history. This is demonstrably false.

47.     Amy Jones adopted Leslie Johnsons' recommendation verbatim, in its entirety. No alterations were made by Amy Jones to Leslie Johnsons' Recommendation. That *includes* the part where my litigation history was explicitly mentioned as a factor in the recommendation. Even if Amy Jones would not have made that mention on her own if she were the one doing the entirety of the investigation in the first instance, she nevertheless adopted Leslie Johnsons' recommendation that my litigation history play a role in the denial.

48.     42 USC § 12202 clearly states that a state agency (such as the ARS) must be held liable to

any plaintiffs they discriminate or retaliate against to the same extent as any other private entity other than a state. This means they are vicariously liable for the actions of their employees under the doctrine of *respondiat superior*. Therefore, the ARS is liable for the actions of their employees, even if Management did not actively participate alongside the tortfeasors.

49.     Now, if Amy Jones had explicitly rejected the portion of Leslie Johnsons' recommendation that stated that my litigation history should be a factor, and proceeded to adopt the rest of the recommendation, then maybe, just maybe, the Defendants may have had a leg to stand on. We do not need to discuss that novel issue of law in this case, since it is clearly not before the Court.

50.     For the purposes of this case and this case alone, Amy Jones – and, by proxy, the entire ARS – clearly denied my application for ARS benefits at least in part because of my litigation history, and therefore committed a blatant act of ADA Retaliation.

## SECTION IV: PRIMA FACIE DISABILITY DISCRIMINATION CLAIM

51.     For the following reasons, the Defendants are not entitled to summary judgment on the claim of disability discrimination.

### Sub-Section 1: The Defendants' determinations are not sacrosanct.

52.     For the third time this case, the Defendants maintain that their unilateral, arbitrary, and summary determination that I did not meet one of their eligibility requirements is all the evidence they need to defeat my claim of discrimination.

53.     The Defendants have offered absolutely no additional evidence as the case has developed to further back up their claim that I am unlikely to succeed in the workforce. From Day 1, the Defendants have always maintained that their unilateral, arbitrary, and summary determination that I am unlikely to succeed in the workforce is literally the only evidence they need.

54.     Simply put, the Defendants' unilateral determinations are not dispositive of this case. If it

were, no entity would ever be able to commit discrimination because all they would have to do is say that a person's disability made him "ineligible," and the Court would be powerless to override them, no matter how improvidently the determination was made or how little evidence they had to support it. That is simply not how the law[2] works.

55.     If the case goes to trial, the Defendants are entitled to argue their case to the jury. The Defendants' determination may be *a factor* that the jury would be permitted consider, but eve then, it still would not be 100% dispositive of the issue. However, the Defendants at this time are attempting to argue that their unilateral determination entitles them to summary judgment! In other words, they are now arguing that a jury simply has no authority to find the facts in my favor, even if they wanted to!

56.     In short, they are claiming that they are above the law.

57.     This argument is patently frivolous and should be sanctioned.

### Sub-Section 2: "Likelihood of success in the workforce" is not essential.

58.     The Defendants are constantly rubbing our noses in their assertion that they made the determination that I was not "qualified" to receive the Defendants' benefits because I am not "likely to succeed in the workforce." However, they have yet to offer even the slightest evidence that this is even an essential eligibility requirement in the first place.

59.     This is important. If the Defendants cannot show that this is an essential eligibility requirement, then whether or not I meet this requirement is irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986):

> "Only disputes over facts that might affect the outcome of the suit under the governing law" can be used in a Motion for Summary Judgment, and that "factual

---

[2] *Any* law, not just discrimination. There is not one single solitary crime or tort currently recognized by state or federal law where the Defendant's own unilateral, arbitrary, and summary declaration of something, no matter how unsupported by evidence that determination may be, is an absolute bar to a jury verdict in the plaintiff's or prosecution's favor.

disputes [or lacks of dispute] that are irrelevant or unnecessary will not be counted."

60. The Defendants were unquestionably notified that this was to be a disputed fact in this case. In the aforementioned Recommended Partial Disposition, Magistrate Judge J. Thomas Ray stated the following:

> "In ADA cases, rather than simply deferring to an entity providing the service in question and deeming its eligibility rules to be sacrosanct, a reviewing court must undertake an independent analysis of the importance of an eligibility requirement for a public program or benefit. It is inconsistent with the ADA to elevate the unilateral approval of the entity accused of discrimination to the status of an essential eligibility requirement. Furthermore, the United States Supreme Court has cautioned against defining the scope of a public benefit in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled.
>
> [A] public entity shall make reasonable modifications in its policies or practices when necessary to avoid discrimination on the basis of disability unless it can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity." See **Doc. 51, pp. 12-14**.

61. I point this out, not to argue that the Court is bound by this statement, but to point out that the Defendants were unequivocally put on notice that this is a disputed fact. Thus, their failure to litigate it is their own fault.

62. The Defendants hold the burden of proving that their eligibility requirement is essential. See Monette v. Electronic Data Systems Corp., 90 F.3d 1173, 1184 (6th Cir. 1996) ("[I]f a disabled individual is challenging a particular [eligibility] requirement as unessential, the [Defendant] will bear the burden of proving that the challenged criterion is necessary"). See also Olmstead v. LC, 527 US 581, 591 (1999) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, ***unless the public entity can demonstrate*** that making the modifications would fundamentally alter the nature of the service, program, or activity"). See also Pottgen v.

MO St. High Sch. Activities Ass'n, 40 F. 3d 926, 932 (8th Cir. 1994) (same). See also DeBord v. Ferguson-Florissant, 126 F. 3d 1102, 1105 (8th Cir. 1997) (same). See also Koester v. Young Men's Christian Ass., 855 F. 3d 908, 911 (8th Cir. 2017) ("Furthermore, discrimination includes the failure to make reasonable modifications in policies ... unless doing so would fundamentally alter the nature of the service"). See also Alsbrook v. City of Maumelle, 184 F. 3d 999, 1009 (8th Cir. 1999) ("Only if *a state can demonstrate* that modifications would 'fundamentally alter' the nature of the service ... could a court uphold the state's policy"). See also Roberts v. KinderCare Learning Centers, Inc., 86 F. 3d 844, 846 (8th Cir. 1996) ("A public accommodation must ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals ... unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the ... service[s] ... being offered").

63.     To be an "essential" eligibility requirement, it must be one that is so vital to the service provided that waiving, curbing, or relaxing the requirement would fundamentally alter the nature of the service. The key word here is "fundamentally." In other words, the slightest inconvenience or slightest increase in overhead costs does not permit the Defendants to discriminate on the basis of disability.

64.     The SCOTUS case of PGA Tour, Inc. v. Martin, 532 U.S. 661 (2001) provides substantial guidance and precedent in interpreting whether or not a modification to a policy would in fact "fundamentally" alter the service provided. In that case, the primary factual dispute was whether permitting the plaintiff to use a golf cart would have fundamentally altered the nature of the golf competition. In support of their position, the Defendants offered expert testimony that "fatigue can be a critical factor in a tournament, particularly on the last day when psychological pressure is at a maximum. Their testimony makes it clear that, in their view, permission to use a cart

might well give some players a competitive advantage over other players who must walk." Id at

670-71. The District Court nevertheless found – and the Supreme Court affirmed – that this alone

does not suffice as a "fundamental" alteration to the nature of the tournament. In the exact words

of the Supreme Court ...

> "A modification that provides an exception to a peripheral ... rule without
> impairing its purpose cannot be said to 'fundamentally alter' the [public service].
> What it can be said to do, on the other hand, is to allow [the Plaintiff] the chance
> to qualify for ... the athletic events petitioner offers to those members of the
> public who have the skill and desire to enter. That is exactly what the ADA
> requires." See *id* at 690.

65.     So let us take that definition of a "fundamental alteration," and apply it to the instant case.

If we get rid of the requirement that I must be "likely to succeed in the workforce," would that

"fundamentally" alter the nature of ARS's services?

66.     Well, first of all, the Defendants hold the burden of proof on this, as I have already

established. The Defendants have not offered anything whatsoever to support this. It is almost as

if they completely forgot that the essential status of this eligibility requirement was even put in

dispute by J. Thomas Ray in the first place!

67.     Unless and until they show evidence to prove that waiving, curbing, or relaxing the

eligibility requirement that I must be "likely to succeed in the workforce" to qualify for their

benefits would in fact "fundamentally alter" the nature of their program, then whether or not I

meet that requirement is irrelevant. The Defendants have outright refused to offer any evidence

to support this. See **Exhibit 7, Response to Interrogatory No. 2** ("Defendants do not believe

that the policy needs modifying"). In their response to Interrogatory No. 1, the Defendants

explained how this modification *could* be considered as a *minor inconvenience*, but not a

fundamental alteration to the very nature of the service. In other words, they have merely argued

that the requirement of being "likely to succeed in the workforce" is a peripheral requirement,

much like walking a golf course in the PGA Tour. Even then, the Defendants offered no extrinsic *evidence*, aside from their uncorroborated word, that my proposed modification would create even so much as a minor inconvenience.

68.    Assuming without conceding that I hold the burden of proving that a modification to their policies would not fundamentally alter the nature of the service, that begs the question ... would it fundamentally alter the nature of the service? The answer is, unquestionably, no.

69.    By removing the requirement that an applicant must be "likely to succeed in the work-force," the ARS is still providing education and career training to disabled citizens of Arkansas. If anything, removing this requirement would merely *expand* the scope of citizens who would be eligible for ARS's services. "This is exactly what the ADA requires." See *PGA Tour*, supra at 690. It is not like anyone who was previously eligible for ARS benefits would no longer get them!

70.    Alternatively, removing the requirement that the applicant have a disability at all would indeed fundamentally alter the service. At that point, the State of Arkansas would essentially be handing out free college education for everyone, indiscriminately. While the State would certain-ly have the right to enact such a policy if they were so inclined (indeed, 2016 Presidential candi-date Bernie Sanders pledged that very thing if he were elected President), that is clearly a very different social service than what the ARS is supposed to provide. Thus, they would not be requi-red to modify their policies if the proposed modification would effectively turn them into that.

71.    However, the Defendants' eligibility requirement that the applicant not only must be *willing* to obtain an employment outcome, but must be "likely" to succeed, does not appear to serve any fundamental purpose to the ARS's mission. At best, it would be classified as a peripheral requirement (as stated before), but realistically, it does not appear to be even so much

as be a peripheral requirement; rather, just seems to be a wild card the Defendants can play whenever they do not want to give a disliked applicant any benefits but cannot come up with any other excuse to do so.

72.     Even if another potential use for this policy may *hypothetically* exist, the Defendants are unquestionably using that eligibility requirement in this case (the only case that matters at this exact moment in time) as such a wild card. They refused to examine me personally, based their determination exclusively on the *existence* of a handful of symptoms, and then made the argument that their determinations are impervious to judicial review, that their determinations are irrefutable evidence no matter how erroneous they are![3]

73.     So even if the Defendants can articulate a hypothetical purpose this eligibility requirement may serve, they still should not be permitted to use it here, since they are clearly acting with bad faith and unclean hands in the instant case.

### Sub-Section 3: The Defendants' eligibility requirement is unfairly vague

74.     This is additional evidence that the eligibility requirement that I must be "likely to succeed in the workforce" is just being used by the Defendants as a wild card to allow themselves to deny benefits to whoever they want is the fact that the eligibility requirement does not even have any clear and objective criteria to be met.

75.     First of all, what exactly counts as "success" in the workforce? Does "success" mean I routinely earn raises and promotions at work? Or do I simply have not *not get fired*? If I have to routinely earn raises and promotions, then how frequently must I earn them? If I need only not get fired, then how long must I continuously hold that job before I am classified as "successful in

---

[3] In their own Motion for Summary Judgment, they argued "the determination of whether an individual is likely to succeed in the workforce is solely at the discretion of the ARS." By making this argument in a Motion for Summary Judgment, as opposed to arguing their case to a jury, they are essentially claiming that the federal court has no authority to override or sit in review of their decisions, no matter how contrary to the weight of evidence they may be.

the workforce," and how soon after graduating college must I be hired?

76.     If I merely need to not get fired to be considered "successful," then does it count against me if my termination is itself a blatant act of disability discrimination? This is probably the most important question of all; after all, the Defendants argue that it is in fact my *symptoms caused by my disabilities* which make me unable to succeed in the workforce! So does that still count even when the employer is himself acting in violation of federal ADA law?!

77.     What if I wanted to branch out with an independent business? For it to be "successful," do I have to make a particular minimum quota of profit each quarter? Or do I just have to not go bankrupt? If it is the former, how much profit must I make? If I need only not go bankrupt, then how many years must the business stay in business before it is classified as "successful?"

78.     But even if we could create a clear and objective definition of what constitutes "success," we still have to create a clear and objective definition of "likely."

79.     Does "likely" to succeed mean I have to have a greater than 50% chance of being successful (however we define that word), or do I have to have a 100% chance of succeeding? In other words, does the slightest possibility that I may not be successful mean I am ineligible for ARS services? Alternatively, is my likelihood dictated by something other than a percentage? The Defendants refused to clarify that question when given the chance. See **Exhibit 7, Response to Interrogatory No. 3**. Therefore, it should be presumed against them.

80.     The fact that these very pertinent questions about ARS's eligibility requirements have absolutely no answers to them is yet another indication that this eligibility requirement is merely in place, not to ensure any efficient and impartial spread of funds, but to do the complete opposite; it is designed to give ARS carte blanche to shape the definitions and scope of their eligibility requirements to fit whatever the situation calls for.

**Sub-Section 4: Defendants' eligibility requirements are inherently discriminatory**

81.     The Defendants maintain that they did not deny my application because of my

disabilities, but rather, because I was "ineligible." However, the eligibility requirement they say I

do not meet is ... that my symptoms make me unlikely to succeed in the workforce. In other

words, my shortcoming is ... being *too disabled*!

82.     Isn't that kind of like saying that a person is "too black to qualify for affirmative action?!"

83.     At least in the case of *PGA Tour v. Martin,* the Defendants' walking requirement was

designed to strategically induce fatigue in the athletes. Casey Martin's impediment was an

unfortunate but still completely unintentional side effect of the walking requirement. But as I

demonstrated above, even that was not good enough in the eyes of the law.

84.     Here, the Defendants do not even so much as have that excuse. Eligibility Requirement

No. 3, on its face, purports to do nothing other than exclude the really egregiously disabled.

85.     That IS discrimination! That is prima facie discrimination! At this point, for the

Defendants to argue that my application was denied because I was "found to be ineligible" is the

equivalent of an employer saying "We didn't refuse to hire the applicant because he was black;

we refused to hire him because he failed to meet all of our job requirements ... one of which is

'not being black.'"

86.     So I now repeat the arguments I made the past two sub-sections: Unless this eligibility

requirement serves, not just a legitimate purpose, but an *essential* one, the Defendants simply

have no right to hold me to that eligibility requirement and that is simply all there is to it.

**Sub-Section 5: The Defendants cannot prove that my
proposed accommodation is not reasonable.**

87.     I have proposed the reasonable accommodation of attending college while simultaneously

receiving therapy for my symptoms.

88.     Once I make a proposal for a reasonable accommodation, the burden of proof shifts to the

Defendants in total to prove that the accommodation cannot be provided. Numerous published

court opinions from the Eighth Circuit make it abundantly clear that I am only required to

*propose* an accommodation, and then the burden shifts to the Defendants. See also Wood v.

Omaha Sch. Dist., 985 F.2d 437, 439 (8th Cir. 1993) (""In a Rehabilitation Act case, plaintiffs

must initially meet the burden of providing evidence sufficient to make at least a facial showing

that reasonable accommodation is possible. ***[Plaintiffs] Wood and Whitcomb have met their***

***burden by proposing [an accommodation]***. The burden then shifts to defendants to prove that

they are unable to accommodate the plaintiffs or that the proposed accommodation is

unreasonable." (emphasis added). See also Benson v. Northwest Airlines, Inc., 62 F.3d 1108,

1112 (8th Cir.1995); Mason v. Frank, 32 F. 3d 315, 319 (8th Cir. 1994); Gardner v. Morris, 752 F.

2d 1271, 1280 (8th Cir. 1985); Arneson v. Heckler, 879 F. 2d 393, 398 (8th Cir. 1989) (same).

89.     For the first time this entire case, the Defendants have offered even the slightest

explanation as to why they believe my proposed accommodation is not reasonable. On Page 21

of their Brief, the Defendants appear to believe that I refused to attend therapy after discharge

from the hospital. This is a bald faced lie. I did indeed attend the single therapy session I was told

to go to. I was not supposed to go to any others. See **Exhibit 1, ¶ 20-22**. I have no idea where

they got the idea that I refused to go to the therapy session.

90.     Even if I did refuse to go, the Defendants have no evidence why I would not have agreed

to go to therapy *when I was the one proposing the accommodation in the first place*! Who in their

right mind would not adhere to conditions that they themselves proposed?

91.     So the Defendants are indeed still without any evidence that my proposed

accommodation is not reasonable.

**Sub-Section 6: I can indeed prove that I am likely to succeed in college.**

92.    Although the Defendants maintain that likelihood of success in the *workforce*, not just likelihood of success in *college*, is an essential eligibility requirement (which it is not), the are missing the point: My proposed accommodation is only unreasonable if I am incapable of being even so much as in college without the proper therapy. As long as I can still be in college in my current condition, even if my symptoms make me unlikely to succeed in the workforce (whatever that means; see Section IV, Sub-Section 3 for details), then simultaneous therapy can get me ready for entry into the workforce while I am simultaneously doing the one thing I can do immediately. Thus, the accommodation becomes reasonable.

93.    In addition to myself, I plan to call not one, not two, but three witnesses at trial to demonstrate that I am indeed very much capable of thriving in college. See **Exhibit 4, Answer to Interrogatory No. 1**. See also **Exhibits 5, and 6**. Exhibits 5 and 6 will be used to impeach the testimonies of Joan Lipsmeyer and Rachel Lanning, respectively, if they do not testify consistently with these exhibits.

94.    As you can clearly see, I have more than enough evidence to prove that I am indeed capable of thriving in college. At that point, there is no reason why I cannot attend therapy and college at the same time.

**Sub-Section 7: Leslie Johnson's Recommendation has been tampered with.**

95.    When the Court ordered the Defendants to produce the electronic copies of their word documents, the Defendants produced the Word document of Leslie Johnson's recommendation. However, by their own admission, this document originally had eight (8) revisions. However, before sending the documents to me, the Defendants purposefully deleted he metadata so I could not see what those seven (7) previous revisions contained. Although Christine Cryer says that the

deletion of metadata was accidental, she odds of that are one in a million, Cryer's statements are not evidence (in part because she is not under penalty of perjury when she says them), and she made no effort to correct the error (instead opting to send the file to me over email, when that also deletes the metadata).

96.     I am currently filing a "Motion for Adverse Inference" and a Brief in support of that motion along with this reply. The contents of both of those documents are hereby incorporated by reference.

97.     Therefore, Leslie Johnson's recommendation – the entire piece of evidence upon which the Defendants base their adverse action – carries no weight because it has clearly been tampered with.

**Sub-Section 8: The accusations of hostile behavior are based on hearsay evidence.**

98.     As I have said before, the Defendants' accusations of hostile behavior are complete lies. But even if they are not, it would still be improper for the Court to consider this evidence, since it is blatant hearsay.

99.     The client contact notes that supposedly contain accusations of hostile behavior and threatening statements all purport on their face to be written by persons named Alana Walls, Lorraine Miller, Caterina Matheny, and Carl Daughtery.

100.    The Defendants have only listed three (3) witnesses who they plan to call in this case: Amy Jones, Leslie Johnson, and Kevin Cook. See **Exhibit 2, Answer to Interrogatory No. 1**. The Defendants stated that they would update this list as more witnesses became available. However, no updates to this list ever came. See **Exhibit 1, ¶ 33**. Therefore, none of the original declarants who purportedly accused me of being hostile or threatening to them are witnesses in this case.

101.    Therefore, the Defendants have offered no admissible evidence that I said anything to them that was even remotely threatening. Therefore, the accusations in this Motion for Summary Judgment must be rejected as having no evidence.

**Sub-Section 9: The hostile behavior is not a material fact because of the *Doane* Precedent.**

102.    Even if the Defendants could prove, using evidence that is not hearsay, that I engaged in hostile behavior with ARS staff *and* that this hostile behavior was a factor in the adverse action, it still does them no good because they have not proven that they would have reached the same decision just on the hostile behavior alone.

103.    The case of Doane v. City of Omaha, 115 F. 3d 624 (8th Cir. 1997) provides the controlling precedent:

> "Once a plaintiff proves that an unlawful motive played some part in the [adverse] decision, the plaintiff is entitled to relief, including compensatory damages, declaratory judgment, and injunctive relief. The defendant may attempt to limit the relief by showing that it would have made the same decision, even absent consideration of the impermissible factor."
> See *id* at 629 (citations and quotations omitted)

104.    As you can see, not only do the Defendants hold the burden of proof on this dispute of fact, but even if the meet this burden, that does not exempt them from liability altogether; it only *limits* the relief they have to provide.

105.    The Defendants have offered no evidence – not even their uncorroborated, self-serving statements (not that that would have been enough, even as-is) – suggesting that they would have reached the same decision even without considering my symptoms. Therefore, their assertion of my hostile behavior – even if it could be proven by evidence that is not hearsay – still does them absolutely no good.

106.    Therefore, all evidence of any hostile behavior must be disregarded as not relevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might

affect the outcome of the suit under the governing law" can be used in a Motion for Summary Judgment, and that "factual disputes [or lacks of dispute] that are irrelevant or unnecessary will not be counted"). See also Conseco Life Ins. Co. v. Williams, 620 F. 3d 902, 910 (8th Cir. 2010) (same). See also Rickard v. Swedish Match North America, Inc., 773 F. 3d 181, 184 (8th Cir. 2014) (same). See also Uhiren v. Bristol-Myers Squibb Co., Inc., 346 F. 3d 824, 827 (8th Cir. 2003) (same). See also Villanueva v. City of Scottsbluff, 779 F. 3d 507, 510 (8th 2015) (same).

## SECTION V: PRIMA FACIE FIRST AMENDMENT RETALIATION CLAIM

107.    The Defendants are not entitled to judgment as a matter of law on the First Amendment Retaliation claim.

### Sub-Section 1: Total censorship is not required.

108.    The Defendants continue to rely on the fact that I have continued to stand up for my rights in court as the sole deciding factor that my First Amendment rights were not deterred by their actions. As I stated before, that is not an essential element of First Amendment retaliation. See Rhodes v. Robinson, 408 F. 3d 559, 568 (9th Cir. 2005):

> "The district court's further holding that [Plaintiff]'s filing *this very lawsuit* somehow precludes relief on the retaliation claim he therein presents goes even further afield. Indeed, were we to adopt such a theory, [First Amendment] civil rights plaintiffs would be stuck in an even more vicious Catch-22. The only way for an [civilian] to obtain relief from retaliatory conduct would be to file a federal lawsuit; yet as soon he or she does so, it would become clear that he or she cannot adequately state a claim for relief. Like its fictional counterpart, this catch exudes an 'elliptical precision about its perfect pairs of parts that [i]s both graceful and shocking.' *Catch-22* at 47. Unlike Colonel Cathcart, however, we are unwilling to indulge a rule that would result in the anomaly of protecting only those individuals who remain out of court." (emphasis in original)

109.    See also Garcia v. City of Trenton, 348 F. 3d 726, 729 (8th Cir. 2003) ("The question is not whether the plaintiff herself was deterred ... What would a person of 'ordinary firmness' have done in reaction to the [adverse action]s? Would he or she have simply ignored them, or would

he or she have been slowed down, at least to some degree?"). See also Santiago v. Blair, 707 F. 3d 984, 992 (8th Cir. 2013) (same).

110.    The Defendants' adverse actions did indeed make me slow down my First Amendment rights at least a little. See **Exhibit 1, ¶ 29**. Therefore, this essential element to First Amendment retaliation is satisfied.

111.    Even if the Defendants could somehow show that I, personally, was not chilled by their actions, that is still not dispositive of this issue. The essential element is whether a *person of ordinary firmness* would have been chilled! The Defendants have not even attempted to offer evidence of that.

112.    As stated before, it is one thing for the Defendants to use such flimsy evidence to stave off my Motion for Summary Judgment. However, for the Defendants to argue that this evidence proves *their* position beyond genuine dispute is absolutely frivolous.

**Sub-Section 2: Defendants offer no evidence that my 1st Amendment access was not chilled.**

113.    In the Defendants' Statement of Undisputed Facts in support of their Motion for Summary Judgment, their final Undisputed Fact is "The actions (or inactions) taken by ARS in December 2015 did not in any way, shape, or form deter or prevent Stebbins with the filing of lawsuits."

114.    This Statement of Undisputed Fact contains absolutely no exhibit whatsoever. They are not even so much as attaching any uncorroborated, self-serving affidavits in support of this statement of fact. The Defendants maintain that this fact is undisputed solely because they say it is. They are not even *pretending* like there is anything more to it than that.

115.    For this reason, the Defendants deserve to be sanctioned. Their insistence that this fact is undisputed without any evidence needed to support it is patently frivolous.

## CONCLUSION

116. The Defendants continue to use their uncorroborated, self-serving, and arbitrary statements and beliefs are not irrefutable evidence. If it were that easy, nobody could ever recover for any tort. They have gone out of their way this entire case to actively avoid any evidence being introduced other than their uncorroborated word. By their own admission, they take it as a personal insult that their word is not simply taken as irrefutable (see Doc. 106: "Defendants ... object to Plaintiff's insinuation that they have been less than truthful").

117. The Defendants deserve to not only have this Motion for Summary Judgment denied, but to also be severely sanctioned for raising the same arguments again and again that were already frivolous to begin with.

118. Wherefore, premises considered, I respectfully request that this Motion for Summary Judgment be denied, and that sanctions be imposed against the Defendants for wasting everyone's time with this frivolous motion.

So requested on this, the 2nd day of January, 2017.

David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com