US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

JAN 29 2018

DOUGLAS F. YOUNG, Clerk
By _____ Deputy Clerk

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF ARKANSAS

DAVID A. STEBBINS                                        PLAINTIFF

VS.                          CASE NO. 3:17-cv-03092

STATE OF ARKANSAS, ARKANSAS
REHABILITATION SERVICES, AND AMY JONES        DEFENDANTS

### BRIEF IN SUPPORT OF RESPONSE IN OPPOSITION TO [131] MOTION FOR SUMMARY JUDGMENT AS TO REHABILITATION ACT CLAIMS

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following Brief in Support of my Response to Doc. 131, Defendants' Motion for Partial Summary Judgment pertaining to my Rehabilitation Act claims.

1.      The only new argument the Defendants raise that was not raised in the previous Motion to Dismiss is that I have not alleged any wrongdoing by the State of Arkansas. However, this complaint about the deficiency of my Complaint is demonstratably false and patently frivolous.

2.      For the most part, I incorporate by reference the contents of my Brief in Support of Response in Opposition to Doc. 109 Motion for Summary Judgment.

3.      However, there is one thing I wish to remind the Court of:

(a)      First, this Court cannot raise new claims or defenses sua sponte, unless it pertains to the Court's subject-matter jurisdiction.

●  See Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011)

"Under [the adversarial system], courts are generally limited to addressing the claims and arguments advanced by the parties. Courts do not usually raise claims or arguments on their own."

●  See also Sanchez-Llamas v. Oregon, 548 US 331, 356-57 (2006)

"The consequence of failing to raise a claim for adjudication at the proper time is generally forfeiture of that claim. As a result, rules such as procedural default

routinely deny 'legal significance' ... to otherwise viable legal claims."

- See also Sayre v. Musicland Group, Inc., 850 F. 2d 350, 353 (8th Cir. 1988) (failure to plead affirmative defenses constitutes waiver of that defense, even if not specifically listed in Rule 8(c)).

- See also Sartin v. Commissioner of Pub. Saf. of St. of Minn., 535 F. 2d 430, 433 (8th Cir. 1976) (same).

(b)     This means that, if the Defendants, in their response to this motion, fail to establish any dispute of material fact, this Court cannot "bail out" the Defendants by raising its own disputes of material fact. To do so would cause the court to become an advocate for the defense, and I should not even have to explain to you why that is not allowed.

(c)     I would also like to remind this Court that it cannot issue an order without giving an explanation behind it. Failure to give an explanation constitutes an automatic abuse of discretion.

- See US v. Burrell, 622 F. 3d 961, 964 (8th Cir. 2010) ("We have held that a district court need not give lengthy explanations ... but this does not permit a district court to give no explanation for its decision");

- See also Rayes v. Johnson, 969 F. 2d 700, 704-705 (8th Cir. 1992)

"The district court may have had reason to deny Rayes' request for subsequent counsel, but no explanation appears in the record. The request was summarily denied twice."

- See also Slaughter v. City of Maplewood, 731 F. 2d 587, 589 (8th Cir. 1984)

"we neverthe-less find it necessary to remand because we cannot determine from the record whether the district court exercised a reasoned and well-informed discretion, so as to permit our review for abuse of discretion."

- See also Foman v. Davis, 371 US 178, 182 (1962)

"[O]utright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules."

- See also Gulf Oil Co. v. Bernard, 452 US 89, 103 (1981)

"We conclude that the imposition of the order was an abuse of discretion. The record reveals no grounds on which the District Court could have determined that it was necessary or appropriate to impose this order."

- See also US v. Walters, 643 F. 3d 1077, 1080 (8th Cir. 2011) ("given the lack of specific findings and the evidence in the record, we find that the district court abused its discretion").

- See also Jarrett v. ERC Properties, Inc., 211 F. 3d 1078, 1084 (8th Cir. 2000) ("The district court's good faith finding was stated in conclusory fashion with no explanation ... Therefore, the court abused its discretion").

- See also Thongvanh v. Thalacker, 17 F. 3d 256, 260 (8th Cir. 1994) ("A careful review of the record reveals no explanation whatsoever for the reduction. Accordingly, the jury award of $4,000 is restored").

- See also Purcell v. Gonzalez, 549 US 1, 8 (2006) ("There has been no explanation given by the Court ... we vacate the order of the Court of Appeals")

- See also Press-Enterprise Co. v. Superior Court of Cal., Riverside Cty., 464 US 501, 513 (1984)

"Thus not only was there a failure to articulate findings with the requisite specificity but there was also a failure to consider alternatives to closure and to total suppression of the transcript. The trial judge should seal only such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected."

- See also United States v. Grinnell Corp., 384 US 563, 579 (1966) ("The District Court gave no explanation for its refusal to grant this relief. It is so important and customary

a provision that the District Court should reconsider it").

- See also Delaware v. Van Arsdall, 475 US 673, 680 (1986) ("In so doing, it offered no explanation why the Chapman harmless-error standard … is inapplicable here.")

(d)     This means that, if this Court wishes to deny this Motion, it must actually state with

(e)     particularity which facts are in dispute, point to the evidence presented by the defense to show that this dispute exists1, and provide citations of law.

(f)     This means that this Court cannot simply say that whatever material fact is "still in dispute" and end the analysis there. It must show what evidence the Defense has that actually disputes my evidence.

4.      With that said, let us move on with the actual rebuttal arguments.

### Section 1: The complaint about my pleading deficiency is untimely and barred by res judicata

5.      First of all, I wish to nip this in the bud right now. The Defendants' current complaint about the lack of alleged wrongdoing by the State of Arkansas is not even properly before the Court in the first instance.

6.      The Court has previously denied a Motion for Sanctions where I argued a similar legal thoery. There, I claimed that their argument that "the determination of whether a person lis likely to succeed in the workforce is solely at the discretion of the ARS" was disposed of when the Motion to Dismiss was denied. This Court held that re-raising the argument on a motion for summary judgment was a different battlefield than on a Motion to Dismiss, and therefore, was not necessarily barred by res judicata.

7.      This, however, is a different story. Here, they are raising, for the first time this case, an alleged deficiency in the factual pleadings of my Complaint. They are not simply arguing an affirmative defense (such as the fact that they are the only ones who get to decide whether I am

qualified or not), nor are they arguing that I have failed to meet my prima facie burden of proof on the torts I am suing for. Rather, they are arguing that there is simply nothing to prove. They argue that I never properly listed any torts against the State of Arkansas to begin with.

8.      This is not a Motion for Summary Judgment. This is an argument that is best taken up in a Motion to Dismiss.

9.      That means that this argument is egregiously untimely. The Defendants should have raised this argument during their Motion to Dismiss. At best, the Defendants could have filed a Second Motion to Dismiss simultaneously along with their Answer, and proceeded to litigate the case while simultaneously allowing the Court to consider whether my Complaint sufficiently alleged wrongdoing by the State of Arkansas.

10.     Because the Defendants did not dispose of the issue when they had the chance, and we are now waist deep into this case after the close of discovery, their argument should be stricken as untimely. Throwing out a party for any reason other than on the merits at this point in the litigation would do more harm than good.

### Section 2: The alleged deficiency is demonstratably false.

11.     Assuming that this Court sees fit to take up this issue despite being egregiously untimely, their complaint is still demonstratably false.

12.     The Complaint clearly alleges wrongdoing by a government agency. The ARS is an agency of the State of Arkansas; therefore, The State of Arkansas is vicariously responsible for the adverse actions committed by the ARS, just as the ARS is vicariously responsible for the actions committed by Amy Jones in her capacity as an agent of that agency.

13.     The Defendants do not appear to dispute the propriety of the ARS as a Defendant, so it appears that they accept that the ARS can indeed be held liable for the acts of her employees

under the Americans with Disabilities Act. Yet they offer no explanation as to why they believe the State of Arkansas cannot be held liable under the same theory of liability.

14.     Do they maintain that the State of Arkansas cannot, on a similar theory, be held vicariously liable for those same acts, even though the State of Arkansas is, for all intents and purposes, a parent company to the ARS? If so, then they provide absolutely no legal citation to back up that legal argument; therefore, the argument is not properly before the Court pursuant to AR Local Rule 7.2(b) and, therefore, must be stricken for incompleteness.

15.     In the case of Tennessee v. Lane, 541 U.S. 509 (2004), the whole State of Tennessee was held liable for the actions of only one of her county courts. In the case of United States v. Georgia, 546 U.S. 151 (2006), the whole State of Georgia was held liable for the actions of just one of her state prisons. In the case of Doe v. Nebraska, 345 F.3d 593 (2003), the entire State of Nebraska was held liable under the Rehabilitation Act for the acts of just one of her child adoption agencies.

16.     Clearly, entire state governments in their totality may be held liable under the ADA and/or Rehabilitation Act for the actions of just one of their offices.

17.     Therefore, the Defendants' arguments are patently frivolous and completely without merit.

### Section 3: Defendants' assessment is not based on expert testimony and therefore carreis no weight.

18.     We now turn to the section of their Motion where they argue that they are not guilty of violating the Rehabilitation Act in the first place.

19.     This whole case, I was acting under the assumption that Leslie Johnsons' determination that I was not likely to succeed in the workforce was based on her medical expert credentials. However, Defendants have since filed Doc. 139 in this case, stating in no uncertain terms that

Leslie Johnson's testimony is NOT being offered as an expert witness.

> "Defendants have not identified Leslie Johnson as an expert ... She is not going to be called to offer medical testimony regarding any of Stebbins' medical diagnoses. Ms. Johnson is not a medical physician."

20.     This means that the Defendants' evidence has even less footing than I originally thought.

21.     The Defendants argue that my symptoms make me unlikely to succeed in the workforce because my symptoms have the potential to impede my work performance. However, only a medical expert is qualified to make that assessment.

22.     If Leslie Johnson is not a medical expert, and the Defendants have no other medical experts to offer expert testimony, then the Defendants' argument that my symptoms make me unlikely to succeed in the workforce has no admissible evidence backing it.

23.     To be qualified to give lay witness testimony, the testimony must be based on the witness's personal knowledge. See Federal Rule of Evidence 602. While the Defendants maintain, in Doc. 156, that Leslie Johnson will testify exclusively to her personal knowledge, they clearly do not understand what personal knowledge means. Suffice it to say ... merely noticing that I have a list of symptoms and then *speculating* that these symptoms would manifest in a vocational setting is the complete opposite of "personal knowledge."

24.     This means that Defendants' Exhibit D ¶¶ 6-9 and ¶¶ 12-13 must be stricken by the Court and not considere by either the Court or the jury.

25.     This means that Amy Jones had no right to base her decision on Leslie Johnson's determination, since the determination required expert credentials that Leslie Johnson simply did not have.

26.     That means that Defendants' Exhibit E, ¶¶ 23-24 must be stricken from the record and not considered by either the Court or the jury.

27.     In total, this means that the Defendants' entire assessment that purportedly occurred between December 14-16, 2015 carries absolutely no weight. The Defendants cannot show that I am not qualified for their services because they did not base this on any proper medical diagnosis.

28.     Therefore, I am entitled to judgment as a matter of law on the question of whether I am otherwise qualified. The Defendants denied my application because of my disabilities and had absolutely zero medical evidence to prove that my disabilities actually *make me* unqualified. Therefore, their argument that I am not qualified must fail.

### Section 4: No medical assessment means there is no evidence of direct threat.

29.     The Defendants argue that my medical condition means that the stressors of college training or entering the workforce would present a health risk to myself and/or the ARS staff. See Defendants' Exhibit E, ¶ 34:

> "I felt that the provision any ARS services to David would potentially jeopardize the safety of any ARS vendor paid to provide services. I felt that David's untreated mental health and instability could be further aggravated / worsen given the stressors of college training, employment, or any involvement with the public at his current mental state, and the risk for David to cause harm to himself or others was too great a risk to take."

30.     However, if this assessment is not based on any medical knowledge, then they cannot prove that I indeed pose this risk. Binding precedent unequivocally requires the assessment of a direct threat under the ADA to be based on a medical opinion. See School Bd. of Nassau Cty. v. Arline, 480 US 273, 288 (1987) (requiring a finding of direct threat to be "based on reasonable ***medical*** judgments given the state of ***medical*** knowledge … In making these findings, courts normally should defer to the reasonable ***medical*** judgments of public ***health*** officials") (emphasis added). See also EEOC v. Wal-Mart Stores, Inc., 477 F. 3d 561, 571 (8th Cir. 2006). ("The Supreme Court requires an individualized direct threat analysis that relies on the best

current *medical* ... evidence in order to protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear") (emphasis added).

31.     Without a medical assessment, the Defendants have not based their determination on any objective evidence. To the contrary, it appears that I was subjected to "discrimination on the basis of mythology — precisely the type of injury Congress sought to prevent." See School Bd. of Nassau Cty., *supra* at 285.

32.     To be qualified to give lay witness testimony, the testimony must be based on the witness's personal knowledge. See Federal Rule of Evidence 602. While the Defendants maintain, in Doc. 156, that Leslie Johnson will testify exclusively to her personal knowledge, they clearly do not understand what personal knowledge means. Suffice it to say ... merely noticing that I have a list of symptoms and then *speculating* that these symptoms would manifest in a vocational setting is the complete opposite of "personal knowledge."

33.     Therefore, the Defendants' claims that I pose a direct threat to the health or safety of myself or others must fail. As I have stated previously, the Defendants hold the burden of proof on the defense of direct threat, and without an expert witness, they simply cannot meet this burden of proof. Therefore, I am entitled to judgment as a matter of law on this matter.

### Section 5: Doc. 155 does not demonstrate lay witness testimony.

34.     In Doc. 155, the Defendants filed their Response in Opposition to my Supplement to Motion for Summary Judgment. There, they attempt to argue that her intended testimony is lay witness testimony. However, every description they give of her testimony suggests that her testimony is medical-based.

35.     They say she will testify about "her work performed in analyzing Plaintiff's records." However, only a medical expert is qualified to interpret medical records for the Court.

36.     They also say that she will testify about "what she based her decisions on, including her

education and experience." See ¶ 6. However, if she has education and experience in a

specialized field, and her testimony is based on said education and experience, then that means

she is an expert in that particular field ... meaning she is subject to disqualification under a

Daubert motion!

37.     They argue that they do not need an expert because they "are not challenging Plaintiff's

diagnosis of Asperger's or any other diagnosis he has been given." This is patently frivolous.

They are arguing that my symptoms A) make me unlikely to succeed in the workforce, and B)

make me a health risk to myself or others if I underwent the stressors of college training. While it

may be mutually agreed upon that I have these disabilities, I *do not admit* that these symptoms

make me unlikely to succeed in the workforce! That is what the Defendants are offering Leslie

Johnson's testimony to prove, and only a medical expert is qualified to make that assessment.

38.     To be qualified to give lay witness testimony, the testimony must be based on the

witness's personal knowledge. See Federal Rule of Evidence 602. While the Defendants

maintain, in Doc. 156, that Leslie Johnson will testify exclusively to her personal knowledge,

they clearly do not understand what personal knowledge means. Suffice it to say ... merely

noticing that I have a list of symptoms and then *speculating* that these symptoms would manifest

in a vocational setting is the complete opposite of "personal knowledge."

39.     The Defendants argue that my case should collapse because I do not have an expert

witness of my own to prove that I have a disability. This is not true. The Defendants have

*admitted*, in response to a request for admissions, that I have these disabilities. See **Doc. 79,**

**Exhibit 1, Answer ot Requested Admission No. 1**. I am not requried to prove what the

Defendants admit to. See Fed.R.Civ.P. 36(b) ("A matter admitted under this rule is conclusively

established unless the court, on motion, permits the admission to be withdrawn or amended").

No witnesses, expert or otherwise, need to be called to prove that fact in this caes.

40.    If you need any further convincing that it is the Defendants, not me, who are mistaken, you need look no further than what is contained in the Supplement that isn't contained in the Defendants' Response to the Supplement: Case law.

41.    I have cited numerous binding precedents in my Supplement to back up my claim that they must have medical (and therefore, expert) testimony to prove that I am a threat to myself or others. See ¶ 12 of the Supplement. The Defendants offer no case law or statutory citations whatsoever to prove that they do not need an expert witness. The simple bottom line is that I am showing case law to prove tha thte law is on my side, whereas the Defendants argue that he law is on their side simply because they say it is.

42.    Just on this alone, their argument is not even properly before the court in the first place! See AR Local Rule 7.2(a): "All motions except those mentioned in paragraph (d) shall be accompanied by a brief consisting of a concise statement of relevant facts ***and applicable law***." Emphasis added.

43.    Therefore, just on this alone, the Defendants' Response ot the Supplement deserves to be stricken, and Sub-Sections 3-4 of this Brief should be upheld in their entirety.

44.    Therefore, Leslie Johnson's testimony about whether A) my symptoms make me unlikely to succeed in the workforce, and B) my symtpoms pose a health risk to myself or others, should be stricken.

### Section 6: The Defendants' complaints of my behavior with ARS staff do not amount to true threats, and therefore, retaliating against them is an act of First Amendment Retaliation in and of itself!

45.    I had wanted to include these arguments in my response to the Defendants' previous

Motion to Dismiss. Unfortunately, I had to cut them out in order to keep the brief under 25 pages, per this Court's case management order, and then the Court struck my separate motion from the record where I attempted to argue this in a separate motion. However, since the Defendants have re-raised the same issues on a separate Motion for Summary Judgment (frivolous as it may be) and therefore have given me 25 more pages to work with, I wish to take this opportunity to make some arguments I did not get the chance to make before. Consider this my attempt to salvage something beneficial out of a completely frivolous motion.

46.     The Defendants allege that their adverse action was motivated, at least in part, because of the threatening behavior I displayed while interacting with them. See Doc. 137, p. 4 ("Stebbins' behavior was so alarming that the Harrison Office staff felt great concerns for their physical safety and reported Stebbins' behavior to the Harrison Police Department").

47.     Before we continue, let me make one thing perfectly clear: I am not conceding to their accusations that I engaged in any threatening or hostile behavior with them in any way, shape, or form! See my Statement of Disputed Facts[1], as well as my own affidavit which I attached thereto, where I vehemently deny that I ever threatened them. To the contrary, this section merley argues that, even if their statements could be proven to be true, it does not matter.

48.     With that said, the Defendants, by their own admission, issued their adverse action in part because of pure speech. The actions they complain about are indeed pure speech; at no point do the Defendants even so much as imply, let alone outright accuse, that I actually *did* anything around them that involved any part of my body except my voice.

49.     Moreover, by their own admission, the adverse action was done because of the content and viewpoint of the speech. They say I acted irritably with them, and that I said that I did not

---

1  The previous one, not the current one. The current one simply incorporates by reference the contents of the previous Statement of Disputed Facts so I did not have to repeat them here.

trust them generally simply by reason of them being "the government."

50.    This counts as political speech. After all, if the reason I do not trust them is because they are the government, then that means that my speech is inherently political.

51.    Therefore, because the speech is inerently political, the proscription of this speech must pass strict scrutiny, otherwise the Defendants' proscribing of the speech is patently unconstitutional. See Citizens United v. Federal Election Com'n, 130 S. Ct. 876, 898 (2010) ("Laws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest'"). See also Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection"). See also United States v. Playboy Entertainment Group, Inc., 529 US 803, 813 (2000) ("Since [an act by a government agency] is a content-based speech restriction, it can stand only if it satisfies strict scrutiny. If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. Ibid. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative"). See also Sable Communications of Cal., Inc. v. FCC, 492 US 115, 126 (1989) ("The Government may serve this legitimate interest, but to withstand constitutional scrutiny, it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms. It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends" Internal citations and quotations ommitted).

52.    When strict scrutiny is applied to a government action, the government holds the burden of proving that the action is constitutional, not on me to prove that the infringement is

constitutional. See United States v. Playboy Entertainment Group, Inc., 529 US 803, 816 (2000).

Strict scrutiny is strict in theory and fatal in practice; a vast majority of free speech restrictions -

approximately 78% of them to be exact – are struck down in court when strict scrutiny is applied.

See Winkler, A. (2006, April 18). Fatal in Theory and Strict in Fact: An Empirical Analysis of

Strict Scrutiny in the Federal Courts. Retrieved January 23, 2018, from https://papers.ssrn.com/

sol3/papers.cfm?abstract_id=897360 (reporting that only "22% of free speech restrictions ...

adjudicated under strict scrutiny survive"). Of the various constitutional doctrines examined by

that study, free speech restrictions were upheld the least, while second plate - miscellaneous

"fundamental rights" - were found to be struck down in 76% of cases. Only religious liberty

burdens were found to be upheld in a majority of strict scrutiny cases, with only 41% of such

laws being struck down.

53.    In short, the Defendants have their work cut out for them on this issue.

54.    The Defendants maintain that my words towards them amounted to theatening behavior.

While threats are generally considered to be a valid exception to First Amendment rights, that

does not mean that the government can just take any speech they disagree with, that has even the

slightest hint of antagonism in it, just slap the label of "threat" onto it, and use that as a wild card

to justify discriminating against that speech. To the contrary, it is clearly-established, black letter

law that only "true threats" are proscribable under the First Amendment. See Watts v. United

States, 394 US 705, 707 (1969):("[A] statute ... which [proscribes] a form of pure speech, must

be interpreted with the commands of the First Amendment clearly in mind. What is a threat must

be distinguished from what is constitutionally protected speech").

55.    "'True threats' encompass those statements where the speaker means to communicate a

serious expression of an intent to commit an act of unlawful violence to a particular individual or

group of individuals." See Virginia v. Black, 538 US 343, 359 (2003). The Supreme Court goes out of its way to caution lower courts that The offensiveness of speech alone – even egregiously offensive and alarming speech, and even if the offense and/or alarm was the speaker's main goal – has been consistently held by the Supreme Court to be insufficient to overcome First Amendment protections. See Snyder v. Phelps, 562 U.S. 443 (2011). See also Texas v. Johnson, 491 U.S. 397 (1989). See also Watts v. United States, 394 US 705 (1969).

56.    The closest the Defendants come to alleging any behavior that could even remotely be classified as "threatening" is as follows:

- I acted "agitated."

- I yelled (although we don't know exactly how loud). Because it's not like I could have merely had a sensitive microphone that ampified my voice.

- I breathed hard (though we don't know exactly how hard). Because again, it's not like I could have just been using a sensitive microphone that picked up my breathing and played it back to the Defendants louder than they would have heard if they were in the same room as me!

- I would not "calm down" (whatever that means).

- I said that I did not like the government and therefore did not like the ARS.

- I said that Kevin Cook was against me as soon as I sat down (but apparently he wasn't against me *before* I sat down).

57.    That is not a threat. Because the source of my supposed hatred of them is the fact that they are "the government," that means that my speech is inherently political. However, the Supreme Court has consistently made clear that political speech "is often vituperative, abusive, and inexact," (see *Watts*, supra at 708), yet is still protected by the First Amendment (see *Watts*,

supra at 706-07: "[P]etitioner's trial counsel moved for a judgment of acquittal ... We hold that the trial judge erred in denying this motion").

58.     In fact, *Watts* has even more of a foundation to make a case for a "threat" than this case does! At least in *Watts*, the citizen clearly uttered words that expressed an unequivocal desire to assassinate the President (see *Watts*, supra at 706: "the jury found that petitioner had committed a felony by knowingly and willfully threatening the President"), and yet even that was upheld as free speech because it was considered "political hyperbole" (see *Watts*, supra at 708). Here, the defendants do not allege even that much! They do not allege that I expressed any desire to inflict any physical pain on them or anybody. They only allege that the raw emotion in my words made them feel just a wee bit uncomfortable, to which they proceeded to haphazardly slap the label of "threat" onto my speech so they could give themselves an excuse to retaliate against it.

59.     The alleged irritiablity in my voice does not amount to a threat. Period. The Defendants offer zero evidence suggesting that cases of people who are irritated with another person usually results in escelation to the point of violence. If there was any empirical evidence – such as a double-blind study – suggesting that such escelation occurs in the majority of cases, then by all means, I defy the Defendants to produce that evidence! But they will not be able to do that.

60.     The Defendants are the ones overreacting to my alleged behavior (if indeed it can be shown to have happened at all), not me. This is best evidenced by **Pages 45 and 48** of **Defendants' Exhibit B** (filemarked as **ARS 70** and **ARS 74**, respectively). When they allegedly called the cops to report my threatening, both dispatch call notes contained the disposition of "No report required." In other words, the Harrison Police Department heard the Defendants' complaints and decided that the alleged conduct, even if true, does not amount to an act of terroristic threatening under Ark. Code Ann. § 5-13-301. So even taking the Defendants' own

evidence at face value, it is clear that the Defendants are merely butthurt, not that I actually threatened them.

61.     So with it established that my alleged hostility with the Defendants over the phone being clearly established as a protected form of free speech (and more importantly, one with clear political ramifications) even if it happened in the first place, that means that Amy Jones committed a separate act of First Amendment Retaliation when she based her adverse action on that.

62.     This means that I am still entitled to judgment as a matter of law on the claim of First Amendment Retaliation.

### Section 7: Defenses' witnesses are still surprise witnesses.

63.     This is another part of the Defendants' Motion that is rehashed from previous motions, and therefore gives me the opportunity to offer expanded arguments against them.

64.     The Defendants maintain that they disclosed the witnesses Catherina Matheny, Alana Walls, and Lorraine Miller because they were named in the documents produced during discovery.

65.     This, however, is egregiously insufficient. The law uneqivocally requires the parties to disclose, not just the names, but also the addresses and telephone numbers of each witness, unless they do not even know themselves what their witnesses' address or phone numbers are. See Fed.R.Civ.P. 26(a)(1)(A)(i)

> "Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties: the name *__and, if known, the address and telephone number__* of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;" (emphasis added)

66.     It is astronomically unlikely that the Defendants do not know the addresses and phone numbers of their own employees. Therefore, they were required to give the addresses and phone numbers to me so I could conduct a proper discovery and background check on them.

67.     They did not disclose this information to me.

68.     Therefore, these people are still surprise witnesses, whether the Defense likes it or not.

69.     Therefore, the statements these people made are still hearsay and therefore cannot be used.

### Section 8: Surprise witnesses just proves that these client contact notes were not originally factors in the adverse action.

70.     Even if the Court does not consider Walls, Matheny, etc. to be surprise witnesses, consider this: They clearly were not intended to be defense witnesses at the outset of the case, were they?

71.     And  if they were not intended to be witnesses at the outset of the case, does that not mean that their statements about my alleged behavior was not a factor in their original adverse action in December 2015?!!! Why would their statements have been crucial to the Defendants' assessment originally, only for their testimony about these statements to not be considered essential when they were summoned to court to justify their assessment?! That defies all logic!

72.     That alone should entice the Court to eclude these witnesses.

### CONCLUSION

73.     In conclusion, the Defendants have miscalculated at every turn. No, they do not get sole discretion to decide whether or not I am qualified. No, they do not get to say that I threatened them solely on alleged behavior that is only slightly antagonistic. No, they do not get to say that a fact is undisputed simply because they claim it. They are wrong on nearly every count.

Wherefore, premises considered, I respectfully request that the Defendants' Motions for

Summary Judgment be denied, that my Motions for Summary Judgment be granted, and any other relief to which I may be entitled.

So requested on this, the 27th day of January, 2018.

David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com